634 A.2d 1019

JUDITH R. BRENNER, PLAINTIFF–RESPONDENT, v. HOWARD BERKOWITZ, RUTH BERKOWITZ, AND ARBEE ASSOCIATES, INC., A NEW JERSEY CORPORATION, DEFENDANTS–APPEL-LANTS.

Argued September 13, 1993—Decided December 29, 1993.

*Jonathan L. Goldstein* argued the cause for appellants (*Hellring, Lindeman, Goldstein & Siegal,* attorneys; *Mr. Goldstein* and *Richard K. Coplon,* of counsel and on the briefs).

*Martin J. Brenner* argued the cause for respondent (*Brenner & Falkin,* attorneys).

The opinion of the Court was delivered by

GARIBALDI, J.

This appeal concerns the interpretation of two provisions of *N.J.S.A.* 14A:12–7. Specifically, we address the rights and remedies of a minority shareholder in a close corporation who claims fraud, illegality, mismanagement, and oppression by the majority shareholders in violation of *N.J.S.A.* 14A:12–7(1)(c), and the requirements for a court-ordered buy-out of a shareholder's interest in a corporation under *N.J.S.A.* 14A:12–7(8).

## I.

In 1973, Irving Resnick invested $144,000 to form Arbee Associates, Inc., (Arbee), a company that sells wholesale furniture to commercial offices. Although Resnick provided the entire start-up capital for Arbee, he retained only ten shares of the company for himself. Resnick distributed the remaining ninety shares as follows: thirty-six shares to his daughter defendant Ruth Berkowitz; thirty-five shares to his daughter plaintiff Judith Brenner; and nineteen shares to Ruth's husband, defendant Howard Berkowitz. (Reference hereafter to Berkowitz is to Howard.)

Resnick entrusted Berkowitz, who had worked for the preceding ten years in Resnick's previous furniture company, with ultimate authority to manage Arbee. The shareholders, at their first meeting, unanimously named Berkowitz president and resolved that "the complete management and supervision of the corporation be ... vested in its president, Howard V. Berkowitz." Further, the shareholders, who had each also been named directors, unanimously resolved that any action taken by the shareholders or directors would require Berkowitz's consent. Berkowitz managed the company between 1981 and 1984 without the benefit of any formal shareholder or board meetings.

Resnick worked with Berkowitz in managing the company until Resnick's death in 1984, whereupon his ten shares were divided equally between his two daughters. Thereafter, the 100 shares of the company were divided as follows: forty shares to plaintiff, Judith Brenner, forty-one shares to defendant Ruth Berkowitz,

and nineteen shares to defendant Howard Berkowitz. That share allocation vested a sixty-percent interest in the Berkowitzes.

After Resnick's death, relations between the Brenner family and the Berkowitz family soured. In September 1987, Brenner's future daughter-in-law, Nancy McGrath left the company, and Brenner's son was fired. Plaintiff believed that these incidents demonstrated Berkowitz's attempt to squeeze her family out of active involvement in the company.

Shortly thereafter, on November 14, 1987, Brenner instituted this action against the corporation and the Berkowitzes. The complaint alleged that Ruth and Howard Berkowitz as directors and officers of Arbee had mismanaged the company, abused their authority, and acted illegally, oppressively, and unfairly toward Brenner, a minority shareholder, in violation of *N.J.S.A.* 14A:12-7(1)(c) by (a) failing to have the Board approve Berkowitz's annual salary; (b) denying Brenner's request to have her counsel present at the November 3, 1987, Board of Directors meeting; (c) precluding Brenner from "participating in the decision-making process and operation of Arbee"; and (d) failing "to provide Brenner with any other effective notice of the affairs of Arbee."

In August 1989, the Chancery Division permitted Brenner to amend her original complaint. In her amended claim, plaintiff repeated the allegations contained in her original complaint and asserted additional acts of misconduct that had allegedly jeopardized her interest in Arbee: (a) the misapplication of a supplier's discount to acquire an account; (b) the misrepresentation of union identity for some of Arbee's non-union employees; (c) the failure to pay sales tax on cash sales to employees; (d) the failure to file W-2 and 1099 forms for temporary employees who earn more than $600 in one year; and (e) the misappropriation of cash funds by Berkowitz. Plaintiff hired an accounting firm to inspect Arbee's corporate books, records, ledgers, invoices, and income statements that uncovered most of the acts of misconduct alleged in the amended complaint. Brenner alleged also that the termination of her son and daughter-in-law had been unfair.

Plaintiff sought the following relief: appointment of a custodian, an order for the sale of the Berkowitzes' stock to Brenner, an order for the purchase of plaintiff's stock by Arbee or the Berkowitzes, dissolution of Arbee, reimbursement for the fees of Brenner's attorney and expert, and such further relief as the court deemed just.

## II.

Evidence adduced at the bench trial established that at the time Arbee was formed, Brenner did not intend to participate in Arbee's management or even to work for Arbee. Brenner's role was solely director and investor.

Brenner received dividends of $17,500 per year from the company until 1985. In that year, Brenner requested an annual salary of $2,000 to $3,000 to establish an Individual Retirement Account. In an arrangement acceptable to Brenner, Arbee began paying Brenner a salary of $26,000 per year in lieu of dividends. Additionally, Brenner received income distributions from real estate holdings connected to Arbee.

Under Berkowitz's management, the company has flourished. Sales have grown from $750,000 in 1973 to $46 million in 1989. A court-appointed expert placed Arbee's value at approximately $4.5 million as of December 31, 1989. In addition, the company has expanded its markets, going beyond New Jersey to open showrooms and warehouses in Washington, D.C. and Maryland. The company has grown from twenty-two employees in 1981 to 155 employees in 1989.

The Chancery Division determined that oppression was required to trigger *N.J.S.A.* 14A:12–7(1)(c). The court held that to demonstrate oppression, the minority shareholder must show that her reasonable expectations had been frustrated, that the majority shareholders had breached their fiduciary duty to her, or that the majority's misconduct had led to a change in the minority's position within the corporate structure. With regard to each of Brenner's allegations, the Chancery Division determined that

Brenner had failed to demonstrate oppression sufficient to trigger the statute.

### *Employment*

Brenner testified that she believed that the shareholders intended Arbee to be a "family enterprise." Thus, she sought relief for the departure of her future daughter-in-law, Nancy McGrath, and the firing of her son Andrew from Arbee.

In 1986, McGrath was Arbee's second leading salesperson and by 1987 she was the top salesperson. Nonetheless, McGrath testified that Berkowitz had forced her out of the company to make room in the sales force for his daughter, who was less capable than McGrath. McGrath secured a position in another company after Berkowitz reassigned a particularly lucrative account from McGrath to his own daughter.

Berkowitz fired Brenner's son because Andrew had refused to pay $100 in cash to a company employee for helping him do some work at his home. Apparently, the Brenners and the Berkowitzes had used employees free of charge many times in the past. Brenner's son had refused to pay the cash and instead wrote a check payable to Arbee for $225, the estimated value of the labor and the truck. Berkowitz tore up the check and insisted on the cash payment. When Brenner's son continued to refuse, Berkowitz fired him.

Although Brenner testified that it was her understanding that the company had been formed for "any member of the family, for me or for my children, to take part in, if they so desired ...," the court found Brenner's family had no reasonable expectation of unconditional employment by the corporation. To trigger the statute, Brenner was required to show that the conditions leading to the departure of McGrath from the company and the firing of Andrew had been "targeted" to oppress her. Because plaintiff had not shown a malicious intent, the court found that the business-judgment rule barred it from second-guessing Arbee's management decisions.

## Steelcase Dealership

Brenner claimed that a misapplication of the Steelcase Dealership discount jeopardized her investment in Arbee.

Arbee's distribution of Steelcase products constitutes approximately seventy- to eighty-five-percent of its total sales. The Steelcase account is therefore one of Arbee's most valuable assets. Steelcase granted Arbee a discount-pricing arrangement for preferred customers, one of which was Prudential Insurance Company.

In May 1985, defendants applied Prudential's eighteen-percent discount to an order placed with Steelcase on behalf of the United Nations (U.N.), which was not a preferred customer. Arbee had successfully obtained the U.N. order because it included the discount. Berkowitz claimed that the U.N. order was the result of a clerical error. However, not until this suit was instituted did Arbee repay Steelcase the approximately $18,000 discount that had been applied to the U.N. order. Nevertheless, the court determined that Steelcase's subsequent increase in Arbee's franchise to include the territories of Washington, D.C. and Baltimore tended to undermine plaintiff's claim that the improper discount had jeopardized Arbee's relationship with Steelcase.

## Employees' Cash Purchases

The Chancery Division also addressed Arbee's practice of permitting its employees to purchase furniture at wholesale prices, for cash, free of sales taxes. Those sales were never recorded on the corporate books. Instead, Resnick and Berkowitz spent the funds at their discretion. After Resnick's death, Berkowitz continued the practice until 1986.

Berkowitz testified that he had used the money for company expenses. Sales records (available only for 1985 and 1986) indicated that $27,000 had been collected in cash sales to employees during those two years. In April 1988, five months after Brenner

had filed suit, Berkowitz accounted for $19,450 of the $27,000 and paid the balance to Arbee.

Additionally, Berkowitz paid the back unpaid sales tax on the employee cash sales. In 1990, Arbee filed an amended sales-tax return together with a check for approximately $2,300 to pay sales tax on employee sales for a portion of the taxable years 1985 to 1987.

Defendants concede that that corporate conduct was improper. The Chancery Division enjoined that practice. However, the court found that the use of unreported cash funds could not have frustrated plaintiff's reasonable expectations because the practice had been started by her father, Resnick. Indeed, denying Brenner's motion for reconsideration, the court noted that for Brenner to challenge a "policy that was established by [her] father" was "disingenuous."

### Green Checks

Plaintiff alleged that the failure to pay tax on temporary employees also jeopardized her interest in the company. From 1983 to 1987, Arbee issued "green checks" (*i.e.* checks from the general disbursement account) for temporary employees. Those checks totaled over $223,000. Berkowitz admitted that Arbee had failed to issue W–2 or 1099 forms to some employees who had earned more than $600 per year during that time period. Berkowitz testified that those employees had been independent contractors and thus that Arbee did not have to file W–2 or 1099 forms. Nonetheless, the practice of failing to withhold income taxes or to report those earnings ceased early in 1987, before Brenner filed suit.

The Chancery Division held that the statute aims to rectify "*ongoing* oppression, fraud or illegality." Because all employees had been placed on the payroll at the time of suit, Brenner's sole relief was an injunction against future misconduct.

### Non–Union Workers

Brenner alleges that her investment was also placed at risk because Arbee was improperly assigning non-union workers to union jobs.

Berkowitz admitted that in 1985 he sent non-union Arbee employees to job-sites, had them assume the names of union members, and had them work under those assumed names. That practice ended in 1986, and Berkowitz contends that the unions suffered no financial losses.

Because the trial court required that the oppression, fraud, or illegality be continuing, the Chancery Division only enjoined Arbee from returning to the previous practice. .

### Berkowitz's Compensation

Brenner also asserted that Berkowitz was receiving a salary in excess of that authorized by his employment agreement. Berkowitz entered into an employment agreement with Arbee in November of 1976 that set his annual salary at $125,000 unless Arbee's board later determined that he should be paid a different amount. Berkowitz received two board-approved salary increases, with the result that in June 1981 he was earning $350,000 per year. Starting in 1983, however, he began to take salaries in excess of the approved sum. By 1989, Berkowitz reported a salary of $474,206.

Although Berkowitz testified that his compensation was clearly reflected in Arbee's financial statements and that the directors of the corporation knew of his compensation through informal discussions, plaintiff had received no official notice of the salary increases. Plaintiff produced evidence that tended to show that Berkowitz's compensation was excessive in comparison to Arbee's pre-tax profits.

The trial court rejected Brenner's allegation that payment of Berkowitz's annual salary was oppressive to her or that her expectations had been frustrated by Berkowitz's salary. It found

that Berkowitz's salary was reasonable in light of the company's impressive growth. The court hinted, however, that if Berkowitz's salary continued to grow "at the expense of the corporation and its shareholders," and without corresponding increases of dividends or other benefits to the minority shareholder, Berkowitz's salary might be grounds for "a future claim of oppression."

### Brenner's Removal from the Board

Finally, although the removal of plaintiff from the Board of Directors had frustrated her reasonable expectations in the corporation, the court determined that "appointing a receiver or provisional director" as permitted by the statute "would not be feasible given Arbee's consistent growth." Thus, the court ordered that plaintiff be reinstated as a Director. Although the court found that plaintiff had proven the illegal and fraudulent acts of (1) misapplication of discounts, (2) improper assumption of union identity, (3) failure to collect tax on employee sales, and (4) failure to file W–2's and 1099's on behalf of temporary employees, it nonetheless concluded that prior to trial the corporation had taken corrective action to ensure that those acts of misconduct had ceased. Relying on *Balvik v. Sylvester,* 411 *N.W.*2d 383 (N.D. 1987), the court determined that for relief to be granted a continuing course of misconduct must be shown. Thus, the court held that "since the above mentioned bases for oppression have ceased, the court [could not] award statutory relief." The court did, however, enjoin Berkowitz from engaging in future misconduct in violation of his fiduciary duties.

More importantly, the court did not believe that considering Arbee's size, the few isolated acts of mismanagement had substantially affected Brenner or put her investment in the corporation at risk. In denying defendants' motion for a directed verdict, the court nonetheless observed:

> If you're talking about Joe's Delicatessen and they're giving away five pounds of bologna out the back door every day, that might be a substantial defalcation, it might be a gross mismanagement ... [but] in the size of a corporation like this [it] would be de minimis, wouldn't it?

What I'm suggesting to you is, that there has to be some equation here. It seems to me it has to have something to do with the degree to which the alleged mismanagement substantially affects the minority stockholder because there's a two-way street here. The statute not only protects the minority stockholder, but I view it *also* as a protection, as well, perhaps not intentionally drawn, for the majority. To buy out a substantial minority interest is not an easy task, particularly today when bank financing is very difficult to come by.

So it seems to me that since the burden is traditionally on the plaintiff, anyway, and since I owe an obligation to the majority stockholders as well as the minority, it just seems all to fall into the same conclusion that it has to be substantial.

At the conclusion of the trial, the court granted Brenner an injunction against future misconduct by Arbee and ordered her reinstatement to the Board. In the absence of an appropriate motion, the court believed it had no authority to order a buy-out under the statute. The court did not award counsel fees or costs.

Plaintiff filed a motion for reconsideration. First, she asked the trial court to determine that Berkowitz's misconduct had been sufficiently substantial to qualify as "oppressive" within the meaning of the statute. Second, she requested the court to exercise its inherent authority to order a buy-out by ordering defendants to purchase Brenner's shares or by ordering the Berkowitzes to sell their shares to Brenner.

In denying plaintiff's motion for reconsideration the court again set forth the core of its reasoning:

In one case, if you are operating a delicatessen the removal of a hundred dollars a week from the till might be an exceptionally vexatious thing. If someone was dealing in a substantial corporation the removal of a hundred dollars a week, though wrong and not condoned by this Court, when replaced back certainly has to be viewed in a sense that it would not necessarily put the minority stockholder at risk. So we have to look at it realistically and under the fact[-]sensitive aspect of all these cases.

## III.

The Appellate Division reversed the Chancery Division's judgment and remanded the case, holding that a finding of oppression is not necessary to trigger the statute if mismanagement, fraud, or illegality has been shown. *Brenner v. Berkowitz*, 261 *N.J.Super.* 63, 75, 617 *A.2d* 1225, 1230 (1992). Further, even if oppression

were required, oppression exists whenever a company conducts its business illegally or fraudulently. *Ibid.* The court concluded that proof of "fraud or illegality" establishes a *per se* cause of action under the statute. *Id.* at 75–76, 617 *A.*2d at 1231.

In addition, the Appellate Division disagreed with the court's holding that the statute seeks to remedy only "on-going" misconduct, and that because the misconduct had ceased in this case, plaintiff could not prevail under the statute. *Id.* at 77, 617 *A.*2d at 1231.

Based on its conclusion that plaintiff's proofs had triggered the statute, and its finding that a buy-out was a more desirable remedy than dissolution of a thriving company, the Appellate Division remanded the case to the Chancery Division to entertain a buy-out motion from either party. *Id.* at 81, 617 *A.*2d at 1233. The Appellate Division also ordered reconsideration of whether counsel fees should be awarded under *N.J.S.A.* 14A:12–7(10). *Ibid.*

We granted defendants' petition for certification, 133 *N.J.* 435, 627 *A.*2d 1141 (1993).

## IV.

A review of the statutory predecessors to *N.J.S.A.* 14A:12–7 aids us in interpreting the current provision. That review illustrates the Legislature's cautious approach to expanding the rights and remedies of minority shareholders.

At common law before statutorily-created grounds for relief had been created, the court would appoint a receiver, "but only when the dissension made it impossible for the corporation to function in the beneficial interests of the stockholders." Stuart L. Pachman, *Divorce Corporate Style: Dissension, Oppression, and Commercial Morality,* 10 *Seton Hall L.Rev.* 315, 319 (1979) (hereinafter Pachman). Dissolution was permitted only in cases of a " 'gross abuse of trust, dissention among the members of the board of directors, or the absence of a properly constituted board of

directors.' " *Bostock v. High Tech Elevator Indus.*, 260 *N.J.Super.* 432, 443, 616 *A.*2d 1314, 1320 (App.Div.1992) (quoting *Freidus v. Kaufman*, 35 *N.J.Super.* 601, 612, 114 *A.*2d 751, 756–57 (Ch.Div. 1955)).

In 1938 the Legislature enacted the first statute that permitted a chancery court to dissolve a deadlocked corporation. Pachman, *supra*, 10 *Seton Hall L.Rev.* at 319 (citing *N.J.Rev.Stat.* § 14:13–15 (1938)). Although the statute permitted judicial dissolution, the statute was "[n]arrowly drafted." *Ibid.* Dissolution was permitted only when the corporation had (1) an even number of directors who were equally divided respecting the management of the corporations *and* the voting shares of the corporation were equally divided, or (2) the shareholders could not agree on the election of an uneven number of directors. *L.*1938, *c.* 303, § 1. In either event, dissolution was an available remedy only if one-half of the shareholders agreed. *Ibid.*

In 1969 New Jersey's law relating to business corporations underwent a complete revision. See *N.J.S.A.* 14A:1–1 to 16–4 (West 1969). The new law increased the court's ability to mandate the involuntary dissolution of a corporation in two ways: (1) it abolished the restriction that only corporations with an even number of directors could seek judicial intervention, and (2) it permitted the action to be instituted by one or more directors or voting shareholders rather than requiring the agreement of one-half of the directors or one-half of the shareholders. Corporation Law Revision Commission, Comment on 1968 Amendments to *N.J.S.A.* 14A:12–7.

Despite the new test, however, protection afforded a minority shareholder in a close corporation remained virtually non-existent. Statutory relief was available to the minority shareholder only if she joined with other shareholders to cause the deadlock necessary for judicial dissolution. The statute provided no relief to the minority shareholder if the directors or controlling shareholders unreasonably frustrated the minority shareholder's expectations.

The 1968 commission did not, however, completely ignore the plight of a minority shareholder in a close corporation. The

commission recognized that one of the primary functions of corporate law was to "provide adequate protection for shareholders, including those with minority interests." Corporation Law Revision Commission, Report of June 20, 1968, *reprinted in* 14A *N.J.S.A.* IX, XI. New section 14A:12–5 provided that dissolution to protect the interests of minority shareholders would be available if the parties had contracted for that right and incorporated that agreement into the articles of incorporation or by-laws of the corporation. *Id.* at XVI.

Few minority shareholders, however, had the foresight or the power to make their investment in a company contingent on receiving the right to dissolve the corporation should dissension arise. Shareholders of close corporations are often family or close friends. *Bostock, supra,* 260 *N.J.Super.* at 444, 616 *A.*2d at 1320. Those persons often fail to provide for involuntary dissolution because they do not expect irreconcilable differences to arise. Moreover, foreseeing every possible scenario in which a minority shareholder would value the right to withdraw her investment at will would be difficult. Terry A. O'Neill, *Self–Interest and Concern for Others in the Owner–Managed Firm,* 22 *Seton Hall L.Rev.* 646, 659 (1992) (hereinafter O'Neill).

Before 1973, therefore, the statute provided for judicial dissolution, but only in cases of deadlock or failure to elect directors for two consecutive years. In close corporations, judicial dissolution was statutorily permitted only if the minority shareholders had reserved the right in the articles of incorporation or by-laws to dissolve the corporation.

Not until 1973 did the legislature create for the first time a statutory cause of action specifically addressing the plight of minority shareholders in close corporations. The need for such a statute was attributable "at least in part, to the fact that traditional principles of corporate law were often unsuccessful at curbing abuses of power by majority interests in closely-held corporations." *Walensky v. Jonathan Royce Int'l, Inc.,* 264 *N.J.Super.*

276, 281, 624 *A.2d* 613, 616 (App.Div.), *certif. denied,* 134 *N.J.* 480, 634 *A.2d* 527 (1993).

According to the Final Report of the Corporation Law Revision Commission, the purpose of the 1973 amendments was to "[enlarge] the rights and remedies available in the event of corporate deadlock or shareholder 'freeze-out' situations." 14A *N.J.S.A.* at XXI (West Supp.1993). The statute expanded the statutory remedies "by adding three alternative remedies to dissolution." Corporation Law Revision Commission, Comment on 1972 Amendments to *N.J.S.A.* 14A:12–7 (hereinafter Comment on 1972 Amendments). Thus, "[t]he new statute gives the court, as well as the parties, some middle ground between the Hobson's choice of deadlock or dissolution." Pachman, *supra,* 10 *Seton Hall L.Rev.* at 323. To ensure that minority shareholders or others suing under the statute do not abuse the statutory protections, however, the Commissioners emphasized that all the remedies were "discretionary." 14A *N.J.S.A.* at XXII.

At the same time that the Legislature created the statutory right of a minority shareholder to challenge actions taken within a close corporation, it also added "as a ground for action ... misconduct or oppressive behavior by those in control of the corporation." Comment on 1972 Amendments. That provision, *N.J.S.A.* 14A:12–7(1)(c), is the first provision we examine.

## V.

*N.J.S.A.* 14A:12–7(1)(c), which became effective in 1974, provides:

(1) The Superior Court, in an action brought under this section, may appoint a custodian, appoint a provisional director, order a sale of the corporation's stock as provided below, or enter a judgment dissolving the corporation, upon proof that

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

(c) In the case of a corporation having 25 or less shareholders, the directors or those in control have acted fraudulently or illegally, mismanaged the corporation, or abused their authority as officers or directors or have acted oppressively or unfairly toward one or more minority shareholders in their capacities as shareholders, directors, officers, or employees.

The rules of statutory construction require us to begin our interpretative analysis by closely scrutinizing the statute's plain language. *See Town of Morristown v. Woman's Club*, 124 *N.J.* 605, 610, 592 *A.2d* 216, 219 (1991). We begin by considering subsection (c), which creates a cause of action unique to close corporations. After determining what circumstances trigger the statute, we will direct our attention to subsection (1), which enumerates available remedies.

We note that subsection (c) applies only to corporations with twenty-five or fewer shareholders. That requirement recognizes that shareholders in close corporations need special protection because of their unique vulnerability. That special vulnerability exists for three reasons.

First, because the majority has the controlling interest, it has the power to "dictate to the minority the manner in which the corporation is run." *Bostock, supra*, 260 *N.J.Super.* at 443, 616 *A.2d* at 1320. Second, shareholders in close corporations frequently consist of family members or friends and once the personal relationship is destroyed, the company deteriorates. *Id.* at 444, 616 *A.2d* at 1321. Third, unlike shareholders in larger corporations, minority shareholders in a close corporation cannot readily sell their shares when they become dissatisfied with the management of the corporation. *Ibid.* Indeed, the discord in the corporation makes the minority stock even more difficult to sell. *Ibid.*

The inability to reflect dissatisfaction by withdrawing one's investment places the majority shareholder in an enhanced power position to use the minority's investment "without paying for it." Arthur D. Spratlin, Jr., *Modern Remedies for Oppression in the Closely Held Corporation*, 60 *Miss.L.J.* 405, 405 (1990) (hereinafter Spratlin). "As a consequence, a shareholder challenging the majority in a close corporation finds himself on the horns of a dilemma, he can neither profitably leave nor safely stay with the corporation. In reality, the only prospective buyer turns out to be the majority shareholder." *Orchard v. Covelli*, 590 *F.Supp.* 1548, 1557 (W.D.Pa.1984), *aff'd*, 802 *F.2d* 448 (3d Cir.1986).

By enlarging the grounds on which an action may be instituted and by eliminating as a prerequisite for the institution of that action the statutory necessity of establishing that "the corporation is unable to function normally in the best interests of its creditors and shareholders," the Legislature demonstrated its intent to increase the protection to minority shareholders who are powerless within a corporation, as well as powerless to leave. *See N.J.S.A.* 14A:12–7 (West 1968) Comment on 1972 Amendments.

The limited bases for statutory relief, however, reflect an awareness that minority shareholders know the limitations of their power at the time they make their investment in a close corporation. Mere disagreement or discord between the shareholders is not sufficient for a violation of the close corporation statutory provision.

## VI.

■ Defendants argue that fraudulent and illegal acts alone do not qualify as statutory violations unless the plaintiff also can show that such acts oppress the minority shareholder. That interpretation contradicts the plain language of the statute, which uses "or" rather than "and" in its description of the various bases for recovery. Moreover, as the Appellate Division observed, the legislative history supports a determination that the Legislature drafted the new statute in the disjunctive "to enumerate additional separate causes of action, independent of oppression"; and therefore " 'illegality' and 'fraud' as used in the statute are not meant to be synonymous with 'oppression.' " 261 *N.J.Super.* at 75, 617 *A.*2d at 1230.

Oppression has been defined as frustrating a shareholder's reasonable expectations. 2 *O'Neal's Close Corporations* § 9.29 at 132 (Callaghan & Co., 3rd ed. 1988). Illegality and fraud may also frustrate a shareholder's reasonable expectations for a company but nonetheless not qualify as oppression. That is so because oppression is usually directed at a minority shareholder personally, whereas fraudulent or illegal conduct can instead be directed at

solely the shareholder's investment in the corporation. For example, misappropriation of funds within a corporation may violate a shareholder's reasonable expectations regarding the management of the company but it may not be oppressive because it is not directed specifically at a minority shareholder. Nonetheless, because such fraudulent or illegal conduct would affect the corporation, and hence the shareholder's stock interest in that corporation, such conduct would be actionable under the statute, even in the absence of oppression, because the statute is written in the disjunctive.

Nor must fraudulent or illegal acts be "on-going" at the time of trial for the statute to apply. The statute's plain language provides that a cause of action exists "upon proof that ... the directors or those in control *have acted* fraudulently or illegally." *N.J.S.A.* 14A:12–7(1)(c) (emphasis added). If the Legislature had intended that the statute apply only to continuing acts, then the use of present tense, *i.e.,* "are acting," would have accomplished that goal. In this statute, the Legislature used a verb form connoting past conduct.

Moreover, as the Appellate Division observed, "A requirement that the fraudulent conduct must be on-going frustrates [the legislative purpose] because it allows the majority to abuse the minority as long as the abuse ceases prior to the date a decision is rendered ..." 261 *N.J.Super.* at 77, 617 *A.*2d at 1231. Requiring that the conduct be continuing would, therefore, work a grave injustice on the minority shareholder by depriving her of a remedy when her reasonable expectations for the corporation are thwarted.

## VII.

Although we agree with the Appellate Division on the disjunctive nature of the statute and the rejection of the requirement that the misconduct be continuing, we need to clarify the court's findings about the amount of fraud or illegality that qualifies as a violation of the statute. The language and result of

the Appellate Division's opinion might lead to the conclusion that any showing of fraud or illegality qualifies as a *per se* violation of the statute. See 261 *N.J.Super.* at 75–76, 617 *A.*2d at 1231. We disagree. A *per se* rule suggests that a court has no discretion to weigh or to consider the effect, if any, of the misconduct on the minority shareholder or her corporate investment.

■ We recognize that the statute should be interpreted broadly to provide remedies for the "distinctive problems of close corporations." 2 *O'Neal's Close Corporations, supra,* § 9.29 at 134. However, in addition to demonstrating fraudulent or illegal conduct, mismanagement, or abuse of authority, *or* oppressive or unfair conduct, a plaintiff must also demonstrate a nexus between that misconduct and the minority shareholder or her interest in the corporation. The remedies that a court will apply will logically depend on the harm to the minority shareholder or her interest in the corporation. In enacting the 1972 amendments the Legislature intended that the court "look beyond direct harm to the value of a shareholder's investment and to consider all pertinent factors." *N.J.S.A.* 14A:12–7, Commissioner's Comment—1972 Amendments. Therefore, in determining the nexus between the misconduct and the harm to the shareholder, the court must consider those acts that affect or jeopardize a shareholder's stock interest as well as those acts that may be specifically targeted to the shareholder. The court has discretion to determine which factors are pertinent to its evaluation of the quality and nature of the misconduct, but certain factors apply in most cases.

■ Because not all violations will cause a minority shareholder ascertainable harm, a court should consider the seriousness of the violation. For example, a corporation's mere failure to abide by a single tax regulation may be insufficient to bring the circumstances within the statute. Similarly, the court should consider whether the misconduct places the minority shareholder's investment at risk. Thus, in the tax violation example, the court should weigh whether the failure to abide by a single tax regulation resulted in a fine that was substantial in relation to the corpora-

tion's net earnings, or otherwise threatened the corporation's existence or its ability to function. Focusing on the harm to the minority shareholder reflects a departure from the traditional focus, which was solely on the wrongdoing by those in control, and reflects the current trend of recognizing the special nature of close corporations. *See* Spratlin, *supra,* 60 *Miss.L.J.* at 411.

Courts also should consider whether the misconduct thwarts the minority shareholder's reasonable expectations of his or her role in the corporation. The special nature of the close corporation requires that the court go beyond considering merely monetary harm.

> The special circumstances, arrangements and personal relationships that frequently underly the formation of close corporations generate certain expectations among the shareholders concerning their respective roles in corporate affairs, including management and earnings. These expectations preclude the drawing of any conclusions about the impact of a particular course of corporate conduct on a shareholder without taking into consideration the role that he is expected to play. Accordingly a court must determine initially the understanding of the parties in this regard. Armed with this information, the court can then decide whether the controlling shareholders have acted in a fashion that is contrary to this understanding * * *. [*Exadaktilos v. Cinnaminson Realty Co.,* 167 *N.J.Super.* 141, 154–55, 400 *A.*2d 554, 561 (Law Div.1979), *aff'd o.b.,* 173 *N.J.Super.* 559, 414 *A.*2d 994 (App.Div.), *certif. denied,* 85 *N.J.* 112, 425 *A.*2d 273 (1980).]

In determining whether a shareholder's expectations are reasonable and whether the corporation or controlling shareholders or directors unreasonably thwarted them, courts should consider even non-monetary expectations of the shareholder. Indeed, "termination of a shareholder's status as an employee is a much more common means of oppression in a close corporation than is infringement of a shareholder's status as a shareholder." 2 *O'Neal's Close Corporations, supra,* § 9.29 at 134. Even the termination of the employment of the shareholder's children in certain situations may constitute oppressive conduct sufficient to constitute a violation under the statute.

■ Based on the circumstances of a given case, additional factors that may warrant consideration include whether the minority shareholder was aware of the misconduct prior to filing suit but failed to act, and whether the minority shareholder participated in

the misconduct. A court could reasonably determine that unfairness would result if a minority shareholder were permitted to seek judicial intervention after years of acquiescence or participation in the alleged misconduct.

Indeed, courts have applied the equitable concept of estoppel to bar relief when a shareholder or director had or should have had knowledge of alleged misconduct but failed to act. See *Francis v. United Jersey Bank*, 87 *N.J.* 15, 31, 432 *A.*2d 814, 822 (1981) (finding that directors are under continuing duty to keep informed about corporation); *Murtland Holding Co. v. Egg Harbor Commercial Bank*, 123 *N.J.Eq.* 117, 122, 196 *A.* 230, 234 (Ch.1938) (noting that stockholder is estopped from objecting to corporate acts performed with his knowledge and assent, and that such assent might be implied from his long silence).

## VIII.

If a minority shareholder has met her burden of demonstrating both misconduct and a nexus between the harm and the minority shareholder's interest in or expectations for the company, the court must then determine what remedy is appropriate to redress the harm.

Subsection (1) provides a list of potential remedies that "may" be imposed when the statute is violated. It states:

(1) The Superior Court, in an action brought under this section, *may* appoint a custodian, appoint a provisional director, order a sale of the corporation's stock as provided below, or enter a judgment dissolving the corporation * * *. [*N.J.S.A.* 14A:12–7(1) (emphasis added).]

The use of the word "may" indicates that the court has discretion in determining whether any of the enumerated remedies is appropriate to a case. *See, e.g., Harvey v. Board of Chosen Freeholders*, 30 *N.J.* 381, 391, 153 *A.*2d 10, 16 (1959) (finding that absent legislative intent to the contrary, use of word "may" indicates that provision is permissive, not mandatory). Here, the legislative intent for this statute affirms the plain meaning of the

language that the remedies are "discretionary." Comment on 1972 Amendments.

■ Neither the parties nor the courts in this case have considered dissolution as an appropriate remedy. We agree. Dissolution is an extreme remedy to be imposed with caution after a careful balancing of the interests at stake:

> The Commission was mindful that ... dissolution of a business is a drastic remedy to be applied with caution. In addition, the Commission recognized that there is often a public interest involved in avoiding dissolution as a remedy in the event of deadlock or internal dissension. [Comment on 1972 Amendments.]

In 1988, the Legislature added subsection (9), which offers guidance for the circumstances under which dissolution is warranted. It states:

> (9) In determining whether to enter a judgment of dissolution in an action brought under this section, the court shall take into consideration whether the corporation is operating profitably and in the best interests of its shareholders, but shall not deny entry of such a judgment solely on that ground. [ *N.J.S.A.* 14A:12–7(9).]

The court is thus required to balance the appropriateness of dissolution as a remedy against the loss to society if the corporation is forced to liquidate. Factors to be considered in weighing the loss to society include the shareholders' loss of goodwill because the corporation is not sold as a going concern, the loss of jobs by employees, and the loss of a steady source of income by suppliers. *See* O'Neill, *supra,* 22 *Seton Hall L.Rev.* at 693.

Caution is needed when determining whether dissolution is appropriate, because "the statutory remedy was meant only to protect the minority, not to provide a weapon to enable it to obtain unfair advantage against the majority." Lawrence E. Mitchell, *The Death of Fiduciary Duty in Close Corporations,* 138 *U.Pa. L.Rev.* 1675, 1730 (1990); Pachman, *supra,* 10 *Seton Hall L.Rev.* at 331. The statute would become a weapon if dissolution were granted each time a minority shareholder demonstrated some misconduct by the directors or controlling shareholders that falls within the statute's requirements. Then, "[m]inority shareholders [might] use the threat of dissolution to force the majority to

accede to their demands or ... to pay sizeable sums in 'settlement' * * *." Pachman, *supra,* 10 *Seton Hall L.Rev.* at 326.

As an alternative to dissolution the Legislature authorized a court-ordered buy-out. *N.J.S.A.* 14A:12-7(8) provides:

(8) Upon motion of the corporation or any shareholder who is a party to the proceeding, the court may order the sale of all shares of the corporation's stock held by any other shareholder who is a party to the proceeding to either the corporation or the moving shareholder or shareholders, whichever is specified in the motion, if the court determines in its discretion that such an order would be fair and equitable to all parties under all the circumstances of the case.

Previously, the statute permitted such a motion to be made only by a fifty (50%) percent shareholder. Corporation Law Revision Commission, Comment on 1988 Amendments to *N.J.S.A.* 14A:12-7. The Appellate Division in *Bostock, supra,* properly held that the statute's plain language permits compulsion of the *sale* of a party's stock to either the moving shareholder or the corporation. 260 *N.J.Super.* at 445, 616 *A.*2d at 1321. Defendant argues, however, that the statute does not permit compelling the *purchase* of the minority's stock by either the majority shareholders or the corporation.

■ Read literally, the statute requires the prospective purchaser—either the corporation or a shareholder in the litigation—to move to compel a purchase of stock held by another shareholder. The requirement that a motion be filed appears to reflect a legislative purpose to authorize specifically only voluntary purchases. Although the Commissioners' Comment suggests that a motion by a shareholder may be sufficient to compel a purchase by the corporation, see Corporation Law Revision Commission, Comment on 1988 Amendments to *N.J.S.A.* 14A:12-7, we are inclined to construe the statute as authorizing specifically only voluntary purchases by either a shareholder or the corporation.

We have no doubt, however, that the enactment of *N.J.S.A.* 14A:12-7 was not intended to supersede the inherent common law power of the Chancery Division to achieve equity. That the court would have the statutory power to order dissolution of a corporation, but not the lesser authority to compel the corporation to use

its assets to acquire the stock of an oppressed shareholder, would make no sense. Both dissolution and a corporate purchase of a shareholder's stock involve a distribution of corporate assets. In the case of dissolution, a distribution results in the termination of the corporation's business, with its assets being proportionately distributed to the stockholders. In the case of a buy-out, the corporation may be required to distribute retained as well as prospective earnings, but the corporate enterprise survives.

Accordingly, although the statute authorizes only voluntary purchases of stock, we are persuaded that in appropriate circumstances a court exercising its equitable powers, as an alternative to dissolution, could compel the purchase of a shareholder's stock by the corporation; under exceptional circumstances, the court's equitable power might encompass the power to compel an involuntary buy-out by the other shareholders. In exercising the remedying of an involuntary buy-out, however, a court must exercise caution. Because an involuntary purchase of stock is not a statutorily authorized power, its use should be reserved primarily for those instances in which the only practical alternative to an involuntary buy-out would be dissolution. Indeed, some out-of-state cases suggest that a court-ordered buy-out is permitted solely when the facts warrant a dissolution but the court desires to avoid that drastic remedy. See Gershaw v. Ther–A–Pedic Sleep Prods., 218 N.J.Super. 350, 356, 527 A.2d 923, 925 (App.Div.1987) (citing Meiselman v. Meiselman, 309 N.C. 279, 307 S.E.2d 551 (1983), and Orchard, supra, 590 F.Supp. 1548).

In Gershaw, the Appellate Division denied a buy-out when the shareholder sought an order permitting inspection of corporate records and a declaratory judgment to identify the membership of the board of directors. Id. 218 N.J.Super. at 356, 527 A.2d at 925. The Gershaw court based its holding partially on the fact that the plaintiff had not instituted the action under N.J.S.A. 14A:12–7(1), and therefore the buy-out provision of N.J.S.A. 14A:12–7(8) could not be activated. Id. at 355, 527 A.2d at 925. Nonetheless, a corporation's failure to permit a shareholder to inspect corporate

records could fall within *N.J.S.A.* 14A:12–7, but that violation alone most likely would not warrant the statutory remedies.

Although a buy-out may be preferable to dissolution, other remedies may be more appropriate to a buy-out. The statute itself states that a buy-out is warranted only when it would be "fair and equitable to *all* parties." *N.J.S.A.* 14A:12–7(8) (emphasis added). Indeed, the Commission provided that "[e]ach of these remedies is ... not exclusive; accordingly, the court is given the flexibility necessary to handle any particular situation." Corporation Law Revision Commission, Final Report—June 15, 1972, 14A *N.J.S.A.* XVII, XXII (West Supp.1993).

Based on the permissive wording of the statute, when a statutory violation occurs, a court retains its discretion to fashion equitable remedies. Such equitable remedies are valuable because they allow relief to be fashioned directly to redress the statutory violations shown. Equitable remedies

"are distinguished for their flexibility, their unlimited variety, their adaptability to circumstances, and the natural rules which govern their use. There is in fact no limit to their variety and application; the court of equity has the power of devising its remedy and shaping it so as to fit the changing circumstances of every case and the complex relations of all the parties." [*Sears, Roebuck & Co. v. Camp*, 124 *N.J.Eq.* 403, 411–12, 1 *A*.2d 425, 429 (E. & A.1938) (quoting John N. Pomeroy, *Equity Jurisprudence* § 109 (John N. Pomeroy, Jr., ed., 4th ed. 1918)).]

In many other states, statutes authorize "courts to provide relief other than dissolution, and then [set] out a *nonexclusive* list of what that relief may be." 2 *O'Neal's Close Corporations, supra*, § 9.35 at 169 (emphasis added). Some of the equitable remedies O'Neal lists are:

(1) Cancelling or altering any provision of the articles of incorporation or the bylaws;

(2) Cancelling, altering, or enjoining any resolution or other act of the corporation;

(3) Directing or prohibiting any act of the corporation or of the shareholders, directors, officers, or other persons party to the action;

(4) Providing for the sale of all the property and franchises of the corporation to a single purchaser;

(5) Requiring dissolution at a future date, effective only if the parties do not resolve their differences before that time;

(6) Appointing a receiver or special fiscal agent to continue the operation of the corporation for both majority and minority until differences are resolved or until oppressive conduct ceases;

(7) Retaining jurisdiction for the protection of minority shareholders without the appointment of a custodian, receiver, or similar official;

(8) Ordering an accounting or ordering access to corporate records;

(9) Enjoining continuing acts of oppressive conduct, *e.g.*, by reducing unjustified or excessive salary or bonus payments to controlling shareholders;

(10) Requiring declaration of a dividend;

(11) Permitting the minority to purchase additional shares;

(12) Rescinding a corporate act that is unfair to the minority;

(13) Treating a group of related corporations as a single entity for the purpose of determining appropriate relief. 2 *O'Neal's Close Corporations, supra,* § 9.35 at 170–171; *see also Baker v. Commercial Body Builders, Inc.,* 264 *Or.* 614, 631–33, 507 *P.*2d 387, 395–96 (1973) (listing ten alternatives to dissolution for resolving minority shareholder's claims against close corporation); Spratlin, *supra,* 60 *Miss.L.J.* at 420–22.

The existence of less harsh remedies has the effect of increasing the willingness of courts to intervene and provide relief to shareholders.

## IX.

With regard to *N.J.S.A.* 14A:12–7(1)(c), we hold that (1) the statute is written in the disjunctive and therefore a finding either

of fraud or of illegality, without a finding of oppression, may be sufficient to permit a court to conclude that the statute has been violated; (2) the statute does not require that the misconduct be continuing for a violation to be established; and (3) the court must consider the quality of the misconduct to determine whether the minority shareholder has demonstrated a nexus, *i.e.,* that the misconduct caused harm to the minority shareholder or her interest in the corporation.

We reject plaintiff's argument that *any* showing of illegality or fraud qualifies as a *per se* violation of the statute. Instead, the trial court must evaluate the quality of the misconduct or oppression to determine its seriousness. Although we encourage a review of whether the misconduct or oppression is directed at the minority shareholder, even fraudulent acts not directed specifically at the shareholder, but that place the minority shareholder's interest in that corporation at risk, may be sufficient to constitute a violation of the statute.

We hold that the statutory remedies of *N.J.S.A.* 14A:12–7(1) are discretionary. Even when the statute is triggered, the trial court has the discretion to choose the appropriate remedies. Most acts of misconduct or oppression will warrant some type of remedy, but only the most egregious cases will warrant the drastic remedies permitted by the statute. Importantly, courts are not limited to the statutory remedies, but have a wide array of equitable remedies available to them.

Indeed, the statutory remedy of dissolution should be imposed only in the most egregious cases. The buy-out remedy is a preferable alternative to dissolution, but it may not be preferable to equitable remedies also available to the court. In many cases, the court will find that its equitable powers adequately balance the need to redress the statutory violation against society's interest in maintaining functioning corporations.

Cases involving *N.J.S.A.* 14A:12–7(1)(c) are very fact-sensitive, and thus any hard and fast rules are difficult to formulate. The many possible types of relationships in close corporations compel a

flexible approach to the problem. The statute intends to protect minority shareholders in the vulnerable setting of a close corporation. Because the Legislature's goal was fairness to all shareholders, however, courts must ensure that minority shareholders are not permitted to use the statute to tyrannize the majority.

█ Applying the law to the facts of this case, we find that the quantity and substantiality of the acts of misconduct committed by defendants do not warrant any more expansive relief than that granted by the Chancery Division. The record contains substantial proof that Brenner never had any expectations that she was going to manage Arbee. From the inception of the corporation, Brenner was intended to be a minority shareholder and a director. Complete control of the management of the business was given to Berkowitz. None of the isolated incidents recounted above prevented the growth of the corporation or Brenner's investment in the company. Indeed the substantial growth of the business has increased the value of Brenner's investment. Nonetheless, we approve of the Chancery Division's injunction against any future acts of misconduct.

█ Although Brenner testified that she expected employment benefits from Arbee, she has not demonstrated that the corporation's termination of her son and future daughter-in-law was oppressive to her. In many close corporations, a shareholder herself may expect to be employed with the company from its inception. Here, Brenner instead expected Arbee to employ her children when they became old enough to work. A shareholder's expectation of employment must be balanced against the corporation's ability to run its business efficiently. Even in the more common case of a shareholder's direct employment with a company, the court is hesitant to overturn the corporation's valued exercise of its business judgment. *Exadaktilos, supra,* 167 *N.J.Super.* at 155–56, 400 *A.*2d at 561–62. Not surprisingly, when the employment of the shareholder's relative is at issue, the shareholder will find it even more difficult to establish that those in control of a corporation acted oppressively. A heightened

burden exists particularly in the case of a relative who was not employed at the beginning of the corporate relationship. The Chancery Division properly concluded that it could not second-guess the corporation's exercise of its business-judgment.

Although the corporate founders never intended that Brenner manage Arbee, she was expected to be a director and a substantial shareholder. The Chancery Division properly reinstated Brenner as a director of Arbee. As a director, Brenner is entitled to review the books and records of the company and to participate in the major decision-making processes of Arbee. We expect that she will be a more active director than she has been in the past. Brenner does not challenge the salary and dividends returned on her investment—perhaps because she considered the salary paid to her son an indirect economic benefit. Nevertheless, as a substantial shareholder of Arbee, she is entitled to financial benefits commensurate with her holdings. As did the Chancery Division, we caution the Berkowitzes that any increase in benefits to the majority shareholders without a corresponding benefit to Brenner may provide Brenner with a future claim under *N.J.S.A.* 14A:12–7. Moreover, the occurrence of future acts of misconduct may require the court to consider other relief, including the appointment of a provisional director.

Finally with regard to attorney's fees, we reverse the Appellate Division's order that the Chancery Division reconsider whether plaintiff should receive attorney's fees pursuant to *N.J.S.A.* 14A:12–7(10). That provision provides:

> If the court determines that any party to an action brought under this section has acted arbitrarily, vexatiously, or otherwise not in good faith, it may in its discretion award reasonable expenses, including counsel fees incurred in connection with the action, to the injured party or parties.

We conclude that *N.J.S.A.* 14A:12–7(10) does not apply to either plaintiff or defendants.

We reverse the judgment of the Appellate Division and reinstate the judgment of the Chancery Division. No costs.

*For Reversal and Reinstatement*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.