687 A.2d 268

ELLEN KELLEY, KURT AXELSSON, MICHAEL AXELSSON, RICHARD AXELSSON AND MARGOT I. AXELSSON, PLAINTIFFS–APPELLANTS, v. BROR ERIC AXELSSON, JR., AXELSSON AND JOHNSON FISH COMPANY, INC., A NEW JERSEY CORPORATION, AND JOHN DOES 1–5, BEING OTHER OFFICERS, DIRECTORS OR PROFESSIONALS, DEFENDANTS–RESPONDENTS, AND JOANN LEIGH GRAMM, ADMINISTRATRIX C.T.A. OF THE ESTATE OF BROR ERIC AXELSSON, SR., DEFENDANT.

Superior Court of New Jersey
Appellate Division

Submitted October 21, 1996—Decided January 7, 1997.

Before Judges BROCHIN, KESTIN and EICHEN.

*Valore Law Offices Chartered,* attorneys for appellants (*Carl J. Valore,* on the brief).

*Horn, Goldberg, Gorny, Daniels, Plackter, Weiss & Casiello,* attorneys for respondents (*Mark Soifer,* on the brief).

The opinion of the court was delivered by

BROCHIN, J.A.D.

Plaintiffs Ellen Kelley, Kurt Axelsson, Michael Axelsson, Richard Axelsson and Margot I. Axelsson are minority shareholders of defendant Axelsson and Johnson Fish Company, Inc. Together they own 166.65 of the 400 shares of its outstanding capital stock. The remaining 233.35 shares are owned by defendant Eric Axelsson, Jr., who is the president of the defendant corporation.

The facilities of Axelsson and Johnson are located in Cape May, New Jersey. Its principal business is purchasing fresh fish from fishing boats at dockside, packaging the fish and selling it to markets located along the eastern seaboard. The corporation also operates a retail fish market, a take-out restaurant, and a raw bar.

Plaintiffs and defendant Axelsson are brothers and sisters. Andrew Johnson and their father, Eric Axelsson, Sr., established the business in approximately 1960. Initially, Johnson was responsible for the general management of the corporation's business. He was also in charge of buying the fish from fishing boats and selling it to the markets. With Johnson's guidance, defendant Eric Axelsson, Jr. became active in the management of the business almost at its inception. In 1962, he began to purchase Johnson's stock pursuant to an agreement to buy all of it over a ten-year period for $100,000, and he completed the purchase in 1972. In 1966, when Johnson became ill, Eric Axelsson, Jr. assumed his responsibilities for the management of the corporation and he has been the chief operating officer at least since 1973. When Eric Axelsson, Sr. died in 1991, Eric Axelsson, Jr. had been the president of the corporation for several years.

Most of the plaintiffs have worked for the corporation from time to time, but none of them has been an officer or director or held a managerial position. None of the plaintiffs was working for the corporation when this lawsuit was filed.

Plaintiffs acquired their shares of stock of Axelsson and Johnson by inheritance from their parents. When the business was incorporated in 1960, 400 shares of stock were issued. The Johnson family owned 200 shares which Mr. Johnson sold to Eric Axelsson, Jr. Eric Axelsson, Sr., plaintiffs' father, owned 194 shares. Annie Axelsson, their mother, owned the remaining six shares. When Mrs. Axelsson died in 1984, she willed one of her six shares to each of her six children. That left Eric Axelsson, Jr. with 201 shares out of the 400 issued and outstanding stock of the corporation. When Eric Axelsson, Sr. died in 1991, he distributed his 194 shares among his children: 32.35 shares to Eric Axelsson, Jr. and 32.33 to each of the plaintiffs. That left Eric Axelsson, Jr. with 233.35 shares and his brothers and sisters, collectively, with 166.65.

Axelsson and Johnson paid dividends in every year from 1983 through 1991. A graph included in an accountant's report shows

the amount of the dividends. Insofar as we can determine from that graph, aggregate dividends were approximately $165,000 in 1983; $230,000 in 1984; $225,000 in 1985; $240,000 in 1986; $270,000 in 1987; $260,000 in 1988; $225,000 in 1989; $280,000 in 1990; and $20,000 in 1991, when Eric Axelsson, Sr. died. No dividends have been paid since 1991. Between 1983 and 1989, officers' annual compensation rose from $50,000 to approximately $180,000. In 1991, it was approximately $220,000 and in 1992, following Eric Axelsson, Sr.'s death, the compensation paid to Eric Axelsson, Jr. and to his son, who is general manager of the corporation, totaled $340,000.

Plaintiffs allege that they have been subject to unfair and oppressive conduct directed toward them as minority stockholders. Their complaint was undoubtedly precipitated by the cessation of dividends and the concurrent increase in the compensation paid to Eric Axelsson, Jr. and his son. They assert that Eric Axelsson, Jr. has paid excessive salaries to himself and to his children; taken opportunities that should have benefitted the corporation; paid personal expenses with corporate funds; caused the corporation to engage in cash transactions that were not recorded on its books; understated the earnings of the corporation and failed to pay dividends; and otherwise mismanaged and diverted corporate assets.

Defendants answered, denying any wrongdoing. In due course, they moved for summary judgment dismissing the complaint, and their motion was granted. Citing *Brenner v. Berkowitz*, 134 *N.J.* 488, 634 *A.*2d 1019 (1993), the motion judge ruled that in order to demonstrate that defendants have acted oppressively or unfairly, plaintiffs must show that their "reasonable expectations" as stockholders have been frustrated. The judge implicitly ruled, and we agree, that since plaintiffs were never active in the management of the business, but are the owners of stock on which dividends were paid regularly, their only reasonable expectations are that dividends would continue to be paid on their stock if funds are reasonably available for the payment of dividends. The motion

court therefore considered whether there was factual support for the plaintiffs' contentions that Eric Axelsson, Jr. had unfairly rendered the corporation unable to pay dividends. It concluded on the basis of the accountants' reports submitted by both parties that defendants were entitled to summary judgment because plaintiffs' contentions were entirely unsupported by their proofs.

Plaintiffs have appealed. The issue for us to decide is whether plaintiffs' proofs, if presented at trial and viewed most favorably to their claims, would be sufficient to enable a fact-finder to rationally infer that defendants have acted "oppressively or unfairly" toward them within the meaning of *N.J.S.A.* 14A:12–7. *Brill v. Guardian Life Ins. Co. of America,* 142 *N.J.* 520, 540, 666 *A.*2d 146 (1995).

We agree with the motion judge that plaintiffs' proofs were not adequate to enable a trier of fact to find that the salaries paid to defendant Eric Axelsson, Jr. and to his son were so unreasonably high, even considering the plaintiffs' reasonable expectations of dividends, that they were unfair and oppressive to the minority stockholders. We also agree that plaintiffs' proofs were insufficient to support their allegations that corporate assets and opportunities were wrongfully diverted to defendant Axelsson's benefit. For the following reasons, however, we conclude that plaintiffs did present evidence from which a judge or jury could rationally find that the corporation has been guilty of a gross failure to maintain an accounting system which properly recorded its business and financial transactions. Such a failure would constitute unfair and oppressive conduct within the meaning of *N.J.S.A.* 14A:12–7. We will first explain our reasons for this holding, and we will then summarize the evidence from which a trier of fact could reasonably find that there has been a dereliction in that respect in this case.

As described by John R. MacKay 2d, 3 *New Jersey Business Corporations* § 14.17 at 14–54 (1992), "There is an emerging recognition in the cases that in most circumstances in close corporations an underlying reasonable expectation of a sharehold-

er is that his or her stock will sooner or later provide an economic return, provided the corporation is not insolvent." Our Supreme Court has shared this recognition. In *Brenner v. Berkowitz, supra,* 134 *N.J.* at 518, 634 *A.*2d 1019, the Court declared that the plaintiff, "as a substantial shareholder of [the corporation] ... is entitled to financial benefits commensurate with her holdings." In *Muellenberg v. Bikon Corp.,* 143 *N.J.* 168, 669 *A.*2d 1382 (1996), the Court noted that "Ordinarily, oppression by shareholders is clearly shown when they have awarded themselves excessive compensation, *furnished inadequate dividends,* or misapplied and wasted corporate funds." *Id.* at 180, 669 *A.*2d 1382 (emphasis added) (citing *Giannotti v. Hamway,* 239 *Va.* 14, 387 *S.E.*2d 725 (1990)). *Cf. In re Kemp & Beatley, Inc.,* 64 *N.Y.*2d 63, 484 *N.Y.S.*2d 799, 801, 473 *N.E.*2d 1173, 1175 (1984)("When the majority shareholders of a close corporation award *de facto* dividends to all shareholders except a class of minority shareholders, such a policy may constitute 'oppressive actions' and serve as a basis for an order ... dissolving the corporation.")

By analyzing plaintiffs' proofs to ascertain whether they presented facts showing that an improper diversion of corporate funds had disabled Axelsson and Johnson Fish Company from paying dividends, the motion judge in the present case tacitly recognized that plaintiffs would be entitled to receive dividends if the corporation's finances permitted. Defendants have implicitly concurred. The whole thrust of their case implies that the corporation would have an obligation to pay dividends if its funds were not needed for other justifiable corporate purposes. Defendant Axelsson has submitted a certification which includes the assertion that "the financial status of Axelsson & Johnson Fish Co., Inc. over the last few years has not permitted the payment of any dividends."

Plaintiffs' ownership of the stock of Axelsson and Johnson gives them the right to share in its economic benefits. Whether they can establish a present right to dividends depends on their ability to ascertain and, if necessary, prove the availability of corporate

funds. For example, if the true net income of the corporation during the past several years has been substantially higher than reported, it is difficult to imagine how the defendants could successfully argue that the equity attributable to that unreported income, even equity represented by indebtedness owed to the corporation by those who have improperly diverted the income, should not be converted to cash and distributed as dividends to the shareholders.

Long before the New Jersey Legislature enacted *N.J.S.A.* 14A:12–7 to provide special protection for minority shareholders in closely held corporations, New Jersey law recognized that "directors of [a] corporation ... occup[y] a fiduciary position toward their stockholders *and it [is] their duty to see that proper and clear records [are] kept of receipts and disbursements of corporate funds and to take and preserve vouchers for all payments made."* *Hollander v. Breeze Corporation,* 131 *N.J. Eq.* 585, 606, 26 *A.*2d 507 (Ch.1941) (emphasis added), *aff'd o.b.,* 131 *N.J. Eq.* 613, 26 *A.*2d 522 (E. & A.1942). This principle is of particular applicability to the present case. Defendants will not be permitted to frustrate the minority shareholders' reasonable expectations of receiving dividends through the device of maintaining an accounting system which hides the corporation's income. Consequently, in the circumstances of this case, maintaining an accounting system whose shortcomings have the effect of substantially preventing the outside, minority shareholders from ascertaining and verifying the corporation's income would constitute unfairness and oppression toward the minority shareholders, entitling them to relief under *N.J.S.A.* 14A:12–7.

In view of that proposition, we turn next to the evidence submitted to the court to support and to oppose defendants' motion for summary judgment. We conclude that if that evidence is presented at trial, the trier of fact could reasonably find that Axelsson and Johnson's accounting system is unfair and oppressive to plaintiffs.

To oppose defendants' motion for summary judgment, plaintiffs relied primarily on two reports of their accountant, Barry R. Sharer, CPA. The first report, dated September 13, 1994, was prepared without reference to the books and records of the corporation, and we infer that it was used to obtain an order which provided access to those documents. The second report, dated December 15, 1994, was based on an inspection of general ledgers, paid invoices, payroll registers, accounts receivable lists and sales registers, customer invoices, sales summaries of retail sales, bank statements and canceled checks of Axelsson and Johnson for 1992 through 1994; and similar categories of records of Seafood Transport, Inc., a related company, for 1993, and of Cape May Ice Co., Inc., another related company, "for various time periods from 1991 through 1994."

Mr. Sharer's purpose in preparing his second report was apparently to determine the value of the corporation. He stated the following among his conclusions:

We find the Company's policies, that defeat the basic accounting controls that are needed to ensure sales and profits are properly reported, to be alarming and unfair to any shareholders attempting to determine the value of this Company.

Strictly speaking, the value of the corporation was immaterial to the merits of defendants' summary judgment motion. The report is pertinent to the motion, however, because the alleged inadequacies of the corporation's records and accounting system are, in our view, relevant to plaintiffs' claims of oppressive and unfair conduct. We therefore turn next to the question whether the factual allegations of the report support its conclusion.

On the basis of his inspection of corporate records, Mr. Sharer "found the Company's accounting system to lack most basic internal accounting controls to ensure proper recording of all sales." The report describes the following shortcomings:

The corporation uses an accounting software program which is capable of automatically updating the sales account in the general ledger when the corporation bills for its sales, and updating the payable accounts automatically when the corporation's own ven-

dors and other creditors are paid. Axelsson and Johnson uses the function of its software which automatically records its payment of accounts payable, *i.e.*, its tax-deductible expenses. But it does not use the software function which would automatically record its receivables, *i.e.*, its taxable gross income. Instead, sales are recorded in the general ledger only on the basis of deposits made to the corporation's bank accounts, and the recorded sales are adjusted annually by changes in the accounts receivable.

Sales journals which list and summarize all bills prepared by Axelsson and Johnson would be a check on the completeness of its records of sales and receipts. The corporation's accountant informed Mr. Sharer that "the company does not print" monthly sales journals. Presumably that means that the data exists in the computer and could be, but is not, printed out. Daily sales journals were available, but they could not be used to verify the completeness of the sales and receipts records because the corporation does not issue prenumbered bills in numerical order and, therefore, there is no way to verify whether all bills were recorded.

According to Mr. Sharer, because no monthly sales journals were available and because entries in the sales journals were not automatically recorded in the general ledger, "it was impossible to verify that all sales were accounted for."

As previously mentioned, sales entries to the general ledger are made from deposits in the corporation's bank accounts. However, the bank deposits are made in round numbers, generally rounded off to thousands. Because the aggregate amount of cash paid by vendees in any given period of time does not regularly arrive in round numbers, all the cash received is not being deposited daily. Furthermore, no cash deposits at all were made during some of the winter months although the corporation continued to make retail sales, presumably mostly for cash, during that period.

Cash register tapes record the corporation's retail sales. The registers record a control number on the tape which increases by one unit each time the register is closed. This number ensures

that all sales recorded in the register are accounted for. The New Jersey Division of Taxation requires these tapes to be retained for at least ninety days for sales tax purposes. *See N.J.A.C.* 18:24–2.4(a) (register tapes may be disposed of ninety days after most recent sales tax filing so long as summary records kept at least three years). Mr. Sharer was told that these tapes were thrown out at the end of each day. Therefore, there was no way for him to verify the amount of the corporation's register sales.

Mr. Sharer performed tests to attempt to ascertain the significance of these shortcomings of the Axelsson and Johnson accounting system. He was given summaries of retail sales for July 1993 through June 1994 which were said to be used to prepare New Jersey sales tax reports. He then compared the corporation's raw bar, take-out counter and retail fish sales for the period July 1, 1993 through December 31, 1993 with the cash and credit card deposits made to the corporation's bank accounts during the same period. The cash and credit card sales for that six-month period totaled $801,083.13. The cash and credit card deposits to bank accounts for the same period totaled $563,415.29. From this data, Mr. Sharer calculated the unreported sales as a percentage of the reported retail sales. He then concluded by extrapolation that annual unreported retail sales for the entire year totaled approximately $358,000.

Seven boxes contained what were estimated to be more than 10,000 Axelsson and Johnson invoices to wholesale customers for the eighteen-month period January 1, 1993 through June 30, 1994. Mr. Sharer selected two of those boxes at random and listed all of the cash payments recorded on those invoices. The cash payments recorded on the invoices in the two selected boxes totaled $120,427.54. By extrapolation, he estimated that the total of cash payments recorded in all seven of the boxes would equal approximately $421,496. On that basis, the annualized wholesale cash sales would equal approximately $280,000.

As previously mentioned, Mr. Sharer noted that the total of retail cash sales exceeded cash and credit card slip deposits to

bank accounts. He inferred from that observation that none of the corporation's recorded wholesale cash sales were deposited in its bank accounts. The total amount of retail and wholesale cash sales in one year which were not deposited to the corporation's bank accounts thus totalled at least $638,000. Since the corporation takes its sales figures from its bank account deposits, its annual gross sales were understated by at least that amount.

Mr. Sharer noted,

> We believe this unreported annual sales figure is a minimum number. The weak controls over sales make it impossible for us to verify if we have been given all invoices and whether the retail sales summaries used for sales tax purposes include all of the retail sales.

However, on the assumption that the corporation's gross margin was equal to the average gross margin of the industry, he estimated that total annual gross sales were understated by approximately $825,000.

Sander J. Greenberg, CPA, the accountant for Axelsson and Johnson, submitted a report in response to Mr. Sharer's. A substantial part of his response was an attempt to show that unrecorded sales were balanced by unrecorded costs and, therefore, income had not been distorted. However, his explanations for what he conceded for the most part to be understatements of income were based on facts which must have been related to him and for which he did not disclose a source. Perhaps because Mr. Greenberg was concerned only with Mr. Sharer's valuation of the corporation's stock, he did not comment on Mr. Sharer's statement of the shortcomings of the corporation's accounting and record-keeping systems.

As we have previously explained, the maintenance of an accounting system whose shortcomings make it inadequate to permit plaintiffs to determine and verify whether the income of the corporation has been substantially higher than reported constitutes unfair and oppressive conduct toward plaintiffs within the meaning of *N.J.S.A.* 14A:12–7. Because there is substantial evidence that the Axelsson and Johnson accounting system suffers

from those shortcomings, defendants' motion for summary judgment should have been denied.

What remedies plaintiffs will be entitled to if they prevail at trial must await the event. The compulsory buy-out which plaintiffs seek is a severe remedy. Alternatives may be more appropriate. For example, certified audits might be required at the corporation's expense. The court might direct the installation of a more effective accounting system with better controls. A fiscal agent or a director to represent the minority shareholders might be appointed. Above all, the nature and extent of the remedy to be applied, if remedy is called for, must depend on plaintiffs' proofs as to the nature and extent of the unfairness and oppression to which they have been subjected. Of course, proof of a substantially higher income than is currently reported may lead to further relief in some subsequent proceeding.

The judgment appealed from is reversed and the case is remanded to the trial court for further proceedings consistent with this opinion.