277 N.J. Super. 67 (1994)
648 A.2d 1161
RALPH MUELLENBERG AND BIKON-TECHNIK, GMBH, PLAINTIFFS-APPELLANTS,
v.
BIKON CORPORATION, DEFENDANT, AND KURT W. BURG, DEFENDANT-RESPONDENT, AND ADDA FINANZIARIA, S.R.L. AND DARIO PASSERINI, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued March 22, 1994.
Decided November 3, 1994.
*68 Before Judges MICHELS, SKILLMAN and KESTIN.
Frederick A. Nicoll argued the cause for appellants Muellenberg and Bikon-Technik (Mr. Nicoll, on the joint brief).
Robert W. Delvanthal argued the cause for appellants Adda Finanziaria and Dario Passerini (Crummy, Del Deo, Dolan, Griffinger & Vecchione, attorneys; Mr. Delventhal, on the joint brief).
Eugene H. Gilmartin argued the cause for respondent (Barry G. Leveen, attorney; Mr. Gilmartin and Melissa Clott Shafner, on the brief).
The opinion of the court was delivered by KESTIN, J.A.D.
On May 10, 1991, plaintiffs, Muellenberg and Bikon-Technik, GmbH ("BTG") filed a complaint in the Chancery Division seeking *69 dissolution of Bikon Corporation ("Bikon" or "the corporation") pursuant to N.J.S.A. 14A:12-7(1). They also sought injunctive relief from asserted patent and trademark infringements; an accounting with respect to unpaid royalty fees and payment of such amounts due; an accounting as to the business and financial affairs of the corporation since 1986; and declarations that defendant Adda Finanziaria, S.R.L. ("Adda") was not a shareholder of the corporation and that defendant Passerini was not a director. Defendants Bikon and Burg counterclaimed for an order removing Muellenberg as an officer and director of Bikon; requiring the sale of Muellenberg's shares to the corporation or other shareholders; restraining him and his corporation, BTG, from unlawfully interfering with Bikon's contractual relationship with its suppliers and customers; and requiring plaintiffs to honor existing licensing and marketing agreements with Bikon. Defendants Passerini and Adda filed a "counterclaim and crossclaim" against plaintiffs and defendant Bikon seeking a declaration that consideration for 100 shares of Bikon had been delivered to the corporation and an order removing Muellenberg as an officer and director of the corporation.
Muellenberg and BTG sought additional relief in an amended complaint: an order requiring Bikon to make immediate cash payment to plaintiffs for all principal and interest due on certain demand notes; and damages for trademark infringement and unfair competition. In an amended counterclaim dated January 23, 1992, Burg and Bikon sought, additionally, a restraint on plaintiffs from selling any of their products encompassed under the licensing and marketing agreements to customers of Bikon in the United States or to anyone selling those products in the United States; and a disclosure of and accounting for any such sales or marketing. In another "counterclaim" amendment dated May 7, 1993, Burg sought an order declaring that Adda had not paid for its Bikon stock subscription and that Passerini, Adda's representative, was no longer an officer or director of Bikon.
*70 The Bikon Corporation was created in September, 1982 by Muellenberg, Burg, and Passerini on behalf of his holding partnership, Adda.[*] Muellenberg is a mechanical engineer and inventor, who holds eighty patents for his inventions. He is the only shareholder of BTG, which was established to promote his inventions, and which owns the trademarks under which the inventions are sold: Bikon, Dobikon, and Bikon-Technik. Other firms are engaged to produce the inventions, including Tecnomeccanica S.N.S. di Sacchi & C. ("TM"), with which Passerini was associated. In 1979, BTG and TM, agreed that TM would be the exclusive manufacturer of products for BTG in Italy, that BTG would make specified minimum purchases annually, and that BTG would have exclusive rights to sell the products manufactured by TM in various countries including the United States.
Burg is also a mechanical engineer with expertise in stress analysis. He was employed in this field of work in Germany until 1976, when he emigrated to the United States and became employed in Westwood by Ringfeder, a competitor of BTG. Muellenberg and Burg had become acquainted while Burg still lived in Germany. From 1980 to 1982, Muellenberg and Burg negotiated concerning Burg's participation in a company to be formed in the United States to promote the sale of BTG products in this country and in Canada. Ultimately, agreement was reached, leading to Burg's resignation of his position with Ringfeder and the creation of Bikon.
*71 In a licensing agreement between Muellenberg and Bikon, the corporation was granted the right of commercial exploitation of Muellenberg's inventions in the United States in exchange for a license fee of 5% of all gross receipts. In a separate distribution agreement between BTG and Bikon, the corporation was granted the right to produce and distribute BTG's products in return for a fee of 5% of gross receipts. Burg did not participate in the preparation of the agreements.
Initially, Bikon operated from Burg's residence in River Vale, for which the corporation paid $700 per month rent, later increasing to $900. Ultimately, when the business was relocated to Orange County, New York in June 1984, $1,350 in monthly rental was paid for its share of property consisting of the Burg family residence and a separate two-story building for the corporation.
Differences began to arise between Muellenberg and Burg over issues relating to control of the day-to-day operations of the corporation; authority to make corporate policy decisions, including those relating to sources of supply other than products and companies controlled by Muellenberg; and Muellenberg's access to sales data, distribution lists and the like. Disputes also ensued over the amount of royalty fees which the corporation was obliged to pay to BTG in respect of its patent and trademark rights, how payments were calculated, and when they were to be made; the right of the corporation to market products manufactured by competing companies; issues related to identifying and using authorized suppliers; the responsibility of the corporation to market new products developed by Muellenberg; and many differences relating to the cost of products and Bikon's pricing policies.
The in-court phase of this case, after an early denial of plaintiffs' motion for preliminary injunctive relief, began on January 19, 1993 with the entry of an order to show cause, at the instance of Burg and Bikon, seeking to restrain Muellenberg, Passerini and Adda from taking any action to dissolve Bikon, and to restrain Muellenberg from interfering with Bikon's contractual relationships with its suppliers, customers or creditors or communicating with them *72 concerning a dissolution of Bikon or a cessation of its business. Temporary restraints were ordered pending the return date on January 22. The injunctions sought were imposed pending trial in an order entered on February 5, 1993.
In the interim, on January 20, a Bikon board of directors meeting was held, attended by Muellenberg, Passerini, and Gregor F. Gregorich, the corporation's secretary. Burg was the only officer and director not present, although he had been notified of the meeting. Muellenberg had called the meeting to dissolve the corporation. The directors were advised of the temporary restraints imposed upon them the preceding day and, instead of proceeding with the announced business, adopted resolutions (1) declaring that the corporation had substantial retained earnings not necessary for the operation of the business, and, therefore, a shareholder dividend in the amount of $600 per share was to be paid (each of the three shareholders  Muellenberg, Burg, and Passerini  held 100 shares of the corporation's stock); (2) providing that the corporation was to retain an outside accountant to determine the amount of accrued royalties for the period ending December 31, 1992; (3) "[t]o better control the expenses of the [corporation] in a time of economic uncertainty," providing that signatory authority was required from both Muellenberg and Burg or just Muellenberg for payments made by the corporation; requiring all payments made by Burg to be supported by proper documentation as deemed reasonable by Muellenberg; and providing that no bank account of the corporation could thereafter be opened or closed without prior approval by the board; (4) requiring that the corporation would thereafter purchase all clamping assemblies solely from Bikon Sistemi, S.r.l., BTG, or such other supplier as would be approved by the board; (5) providing that, in accordance with the by-laws, all expenses incurred by the directors to attend the January 20, 1993 meeting were to be reimbursed by the corporation; (6) declaring, based upon documentation furnished by Passerini, that Adda was a shareholder of the corporation; (7) "discontinuing" the pending lawsuit and dismissing all of the corporation's counterclaims with prejudice; (8) *73 providing that no purchase orders by the corporation to suppliers in an amount greater than $1,000 were to be issued unless signed by two directors; (9) requiring Burg to furnish the board with copies of all contracts currently in force between the corporation and suppliers; (10) providing that Adda's and Passerini's legal costs in the lawsuit were to be reimbursed by the corporation; (11) providing that Muellenberg was to be reimbursed by the corporation for legal costs incurred in the litigation; and (12) approving certain "corrective amendments" to the by-laws.
A second order to show cause was entered on March 9 on the application of Burg and Bikon. The relief sought was an injunction pending trial against Muellenberg, Passerini and Adda from carrying out resolutions 1, 2, 3, 4, 8 and 9 and from "interfering with the usual and ordinary conduct and course of [Bikon's] business." The order to show cause also effectively rescinded instructions given to the Bank of New York to dishonor corporate checks and drafts signed by Burg and to honor only those signed by Muellenberg. A handwritten addition to the order to show cause provided that "Burg shall do nothing with regard to Bikon outside the ordinary course of business."
The order entered on the return date, March 25, was limited in the interlocutory relief ordered. It restrained payment of the dividend and provided that Bikon checks up to $1,000 could be authorized by either Muellenberg or Burg, and that checks for more than $1,000 required the signatures of both except that Burg alone could sign checks designated as payroll. The order also provided that no bonuses or salary increases could be paid.
An order of May 3, on the motion of Muellenberg and BTG, provided that the complaint was voluntarily dismissed except for the plaintiffs' application for purchase of Burg's stock in the corporation, denied plaintiffs' motion to dismiss the counterclaims and crossclaims, supplemented Burg's claims to include a demand for dissolution of Bikon, and denied Burg's motion "for certain injunctive relief."
*74 The matter was thereafter tried, and a decision was made on July 7, 1993. The trial judge determined that Adda was a one-third equal shareholder along with Muellenberg and Burg; and, based upon a finding that Muellenberg and Adda had acted oppressively toward Burg, ordered them to sell their shares in the corporation to Burg for fair market value as of May 10, 1991, the date suit commenced. The question of valuation of the parties' interests remained to be decided.
Muellenberg, BTG, Passerini and Adda moved for a stay which was denied by the trial court. We also denied a motion for a stay along with an accompanying emergent application for leave to appeal.
On October 13, 1993, the trial court, noting that the parties had stipulated the value of the corporation as of May 10, 1991 to be $705,000, or $235,000 for each one-third interest, entered judgment providing that upon the payment of $470,000 by Burg or Bikon within 120 days, Muellenberg's and Adda's interests in the corporation were to be transferred to Burg and that Muellenberg's and Passerini's positions as officers and directors were to terminate. The order for judgment also provided that, pending appeal, Burg was restrained from selling Bikon or any of its shares or assets, or from conducting the business of Bikon other than in the normal and usual course. The costs and fees applications of all parties were denied as was the application of Muellenberg, BTG, Adda and Passerini for a stay pending appeal.
Muellenberg, BTG, Adda and Passerini appealed. Burg cross-appealed conditionally. We denied appellants' motion for a stay pending appeal, as did the Supreme Court.
Before reaching his conclusion that Muellenberg and Passerini (Adda) had acted oppressively and unfairly with respect to Burg, the trial judge first rejected a number of contentions made by the parties as inadequate to satisfy the oppression and unfairness standards of N.J.S.A. 14A:12-7(1)(c). The trial judge then noted:
However, the Court finds that defendant Burg did prove oppression and unfairness of plaintiff and defendant Passerini in the following respects at the January *75 20, 1993 shareholders directors meeting controlled by plaintiff and defendant [Passerini].
First I am convinced that plaintiff and defendant Passerini are not only attempting proper controls through their majority votes as director but have started to freeze out Mr. Burg. And this is oppression. * * *
At that meeting they declared a $180,000 dividend to be paid "forthwith" which they should have known would deprive Bikon of needed cash to operate and thus take away defendant Burg's ability to perform successfully as general manager. They also began to strip Mr. Burg of his day to day control as general manager by resolving that bank account withdrawals should be made only by plaintiff or by joint signatures of plaintiff and defendant Burg contrary to all past practice and despite the lack of any showing of abuse by Mr. Burg in operating the company. They also resolved to have plaintiffs dismiss this case without prejudice but have Bikon's counterclaims dismissed with prejudice, which I find not to be important in itself, but evidence of unfairness and a desire to dump Mr. Burg.
Once I have signed the judgment finding Adda to be a one-third shareholder, I am sure that Mr. Burg will be voted out as a director and because he is an employee-at-will will be terminated as general manager along with his wife and daughter as employees. Plaintiff's counsel acknowledged as much in summation.
But this removal of defendant Burg as a director and employee already under way and soon to be completed and would have been without Court intervention amounts to oppression. In a closed corporation like this, defendant Burg is in effect one of three equal partners. He cannot thus be summarily dismissed not after 11 years of helping to make the company a success and to leave him simply as a powerless one-third shareholder would be unfair.
The trial court's determinations that Adda had paid adequate consideration for its one-third interest in the corporation and that various contentions of the parties respecting the conduct of other parties did not satisfy the standards of N.J.S.A. 14A:12-7(1) are supported by substantial evidence in the record and are correct as a matter of law. Pascale v. Pascale, 113 N.J. 20, 33, 549 A.2d 782 (1988). The determination not to award counsel fees to any party was an appropriate application of N.J.S.A. 14A:12-7(10), well within the trial court's discretion and likewise supported by substantial evidence. However, we regard the trial court's holding that other facts as found satisfy the oppression and unfairness standards of N.J.S.A. 14A:12-7(1)(c) to have been premature and, therefore, erroneous as a matter of law.
It is not sufficient that Muellenberg and Passerini had "started to freeze out" Burg. The statutory remedies of dissolution *76 or buy-out, available when oppression or unfairness has occurred, are so terminal in the context of a corporation's life, that a court should be loathe to reach either result except as a last resort. See Brenner v. Berkowitz, 134 N.J. 488, 510-15, 634 A.2d 1019 (1993). Notwithstanding what the trial court perceived as developing, there was always the possibility that the parties might, out of self-interest, find a way to resolve their differences so as to preclude a maturing "freeze out" from actually occurring, or that they might be assisted in doing so by orders of the court less extreme than dissolution or buy-out. There was time enough for the court to act to protect the various interests at stake. Before ordering so extreme a remedy as a buy-out, other less harsh remedies could have been applied. Ibid. See also Grato v. Grato, 272 N.J. Super. 140, 639 A.2d 390 (App.Div. 1994)
Similarly, with respect to the majority's resolutions limiting Burg's freedom of action as general manager, it was not necessary, at least as of the time of decision, that a buy-out be ordered. Less drastic remedies designed to adjust relationships and powers within the corporation in the best interests of all parties should have been ordered as a first step. Clearly, Muellenberg's efforts to limit Burg's historic freedom of action in the name of protecting his own interests frustrated Burg's expectations. Equally clear, Burg's conduct in disregarding Muellenberg's manifest intentions that Bikon be a profitable marketer of Muellenberg's products frustrated Muellenberg's expectations as an equal co-founder of the corporation. Burg's methods of managing the corporation's business were, as well, contrary to the will of what came to be the corporate majority.
Decisions as to how Bikon should function, what relationships it should have with other companies in which Muellenberg and Passerini had interests, and the nature and extent of its dealings with product competitors had historically been points of contention between Muellenberg and Burg, the only active participants. With the advent of Passerini's active involvement as an officer and director and, on behalf of Adda, as a shareholder, the will of the *77 corporate majority could, for the first time, be, and was, definitively expressed. By use of the court's discretionary authority and flexibility, Brenner v. Berkowitz, supra, 134 N.J. at 514-15, 634 A.2d 1019; Walensky v. Jonathan Royce Intern., 264 N.J. Super. 276, 624 A.2d 613 (App.Div. 1993), an opportunity should have been afforded for the parties to operate under this new regime before an impasse was perceived. One way of accomplishing this would have been to enjoin dissolution and provide occasion for Burg to function as vice-president and general manager subject to the oversight and direction of an active corporate majority.
Our laws governing corporations are based upon majoritarian principles. Brenner v. Berkowitz, supra, 134 N.J. at 511, 634 A.2d 1019; Bostock v. High Tech Elevator Industries, Inc., 260 N.J. Super. 432, 444, 616 A.2d 1314 (App.Div. 1992); Warren v. Pim, 66 N.J. Eq. 353, 387, 59 A. 773 (E. & A. 1904). To the extent that Burg's conduct in managing the corporation was disagreeable to the majority, it could not prevail. If, in such a situation, the minority shareholder's fair and reasonable expectations are irredeemably frustrated, the remedy is not to order a resolution that frustrates the fair and reasonable expectations of the majority, but rather to require the corporation or majority shareholders to buy out the minority shareholder by paying a fair price for his stake in the corporation and possibly also, if legally sustainable and to the extent deemed necessary as a matter of equitable consideration, compensating him for the loss of a contract of employment. For a court to order the sale of the majority's shares is so contrary to basic principles of corporate governance as to require the existence of extraordinary equitable considerations and unavoidable consequences before such relief should be contemplated.
That portion of the trial court's judgment ordering the sale of Muellenberg's and Adda's shares to Burg and the termination of Muellenberg and Passerini as corporate officers and directors is reversed. In all other respects the trial court's judgment is affirmed. The matter is remanded to the trial court for such *78 additional proceedings and orders in conformity with this opinion as may be necessary.
NOTES
[*] The corporation was to be capitalized by initial contributions of $30,000 each from Muellenberg in cash and Adda in products. Burg contributed his services in lieu of additional compensation. At the outset, Burg as the only operating principal was to be paid a salary of $3,500 per month plus an annual bonus of 10% of the net profits of the corporation before taxes up to the first $60,000. Each of the three principals was to be a director of the corporation, with Muellenberg as president, Burg as vice president and general manager, and Passerini as treasurer. In August, 1984, the principals agreed to further contributions of $30,000 each, in goods from Muellenberg and Adda and services in lieu of additional compensation from Burg. In April, 1985 each principal agreed to an additional capital contribution of $10,000 and Burg's salary was increased to $3,850 per month.