658 A.2d 1305

WILLIAM C. MUSTO, AN INDIVIDUAL, PLAINTIFF/RESPON-
DENT, v. VINCENT G. VIDAS, AN INDIVIDUAL; JOHN S.
DEGNAN, AN INDIVIDUAL; AND SEMCOR, INC., A NEW
JERSEY CORPORATION, DEFENDANTS/APPELLANTS.

Superior Court of New Jersey
Appellate Division

Argued February 23, 1995—Decided May 25, 1995.

Before Judges SKILLMAN, WALLACE and KLEINER.

*Anne C. Singer* argued the cause for appellants (*Blank, Rome, Comisky & McCauley,* attorneys; *Stephen M. Orlofsky* and *Ms. Singer,* on the brief).

*Ira G. Megdal* argued the cause for respondent (*Davis, Reberkenny & Abramowitz,* attorneys; *Mr. Megdal* and *Keith Waldman,* on the brief).

The opinion of the court was delivered by

WALLACE, J.A.D.

Plaintiff William C. Musto filed his complaint in December 1990, alleging oppression and breach of fiduciary duties owed to him as the minority shareholder. The trial court concluded that defendants Vincent G. Vidas and John S. Degnan had oppressed plaintiff and ordered reinstatement of plaintiff as officer and director of Semcor, awarded compensatory damages, and required defendants to sell their shares of stock in Semcor to plaintiff. Defendants, the majority shareholders in Semcor, Inc., and the corporation, appeal. We affirm in part, reverse in part, and remand for further proceedings.

## I

Degnan and Vidas incorporated Semcor in 1967. They financed the start up of the company from their savings. Semcor primarily sells engineering systems and management services to the government. In 1968, defendants approached plaintiff about becoming an equal partner in Semcor. Plaintiff expressed concern about the possibility he might be squeezed out in the future. According to plaintiff, defendants orally agreed that Semcor would be run by unanimous consent and entered into what plaintiff referred to as their "no two-on-one agreement."

In May 1968, plaintiff paid $3,500 to Semcor and later paid $2,500 to each of Vidas and Degnan for 100 shares of stock in Semcor. Thus, plaintiff paid $8,500 to become a one-third owner of Semcor. The bylaws were amended to provide that any

decision regarding the commitment of capital stock or compensation of directors and officers was subject to unanimous approval by the board of directors. Further, any revision to this amendment had to be by an affirmative vote of ninety percent of the outstanding shares.

On October 1, 1969, the parties entered into a shareholders agreement which governed disposition of stock in the event of death, retirement, or disability of any of the shareholders. The agreement also provided that "[a]ll matters of decision shall be by unanimous consent of the principal stockholders." The trial court later determined that this provision meant all matters of decision concerning the shareholder agreement, not all matters of decision generally.

Semcor had two divisions—one in Moorestown and one in Washington D.C. The Moorestown division had engineering offices in Moorestown and Fort Monmouth, as well as offices in Pennsylvania and Maryland. The Washington division had offices in Washington, San Diego, Newport, Rhode Island and Virginia Beach. During the 1970s, the Moorestown division did the greater amount of business. Plaintiff was vice-president and director of that division. Vidas was vice-president and director of the Washington division, while Degnan held the title of president. By the early 1980's the Moorestown and Washington divisions were doing about the same amount of business. Vidas disliked the separate divisions because he believed the internal competition made it difficult to get cooperation in the field. As a result Vidas suggested unifying the company, but plaintiff would only agree to the idea if he were made head of the company.

According to Vidas, from the time plaintiff joined Semcor it became apparent that the three shareholder-directors had different management styles and that plaintiff had a need to be "in charge." The three shareholders had difficulty resolving issues and once issues were resolved they would often revisit them. Vidas said that Degnan often became the mediator of disputes involving plaintiff and himself.

In February 1982 the parties entered into a buy-sell agreement wherein they agreed that in the event of the death of one of the shareholders, the corporation would purchase the deceased shareholder's stock for $1,150,000. The agreement also required the corporation to purchase insurance on the life of each shareholder to fund the buy-out.

In 1983 defendants agreed to make plaintiff president because of his insistence that if one person were going to run Semcor it had to be him. Plaintiff also assumed the title of chief executive officer (CEO), Vidas was made vice-president of business operations, and Degnan's new title was vice-president of corporate planning. Plaintiff testified that he took the title of CEO because defendants told him to take any title he thought might impress customers. Plaintiff claimed that defendants told him that if he were successful in getting Semcor back on its prior growth curve, he would be given a bonus of one-quarter of the profits. Defendants denied telling plaintiff that they wanted him to be president because he would be a better spokesman for the company. They also denied that they authorized him to assume the title of CEO. Furthermore, defendants denied promising plaintiff a bonus of one-fourth of the profits if he achieved a thirty percent growth rate per year. They claimed that the issue of a bonus for plaintiff was not raised until late 1986. Consequently, plaintiff's requests for bonuses were refused by defendants.

Vidas conceded that initially plaintiff's leadership was a positive factor. After 1983, Semcor's profits and revenues increased, in large part due to an increase in defense spending. According to plaintiff, approximately a year after he assumed the position of president, Vidas began telling plaintiff that he wanted to be Semcor's president. Vidas denied that he ever demanded plaintiff's job. In any event, plaintiff vetoed any such demand under the parties' alleged unanimity agreement.

Late in 1985 or early in 1986, defendants told plaintiff that they did not want to be involved in the day-to-day operation of the business and that he should hire someone to take over their

responsibilities. Vidas specifically told plaintiff that he could not tolerate working for him. As a result plaintiff hired Ed Ferraro, who eventually became the vice-president and the chief financial officer of Semcor.

Between 1984 and 1986 Semcor's revenue increased from $10,-000,000 to $25,000,000, its profits increased from under $1,000,000 to $2,400,000, and its employees increased from 200 to 500. In 1986 the parties agreed on a new compensation package covering 1987 and 1988. Plaintiff would receive a $200,000 bonus conditioned, according to defendants, on plaintiff finishing the year 1987 as president. Further, it was agreed that plaintiff would receive an annual salary of $250,000, Vidas would receive $175,000 and Degnan would receive $50,000. Degnan agreed to the unequal salaries because he believed that the person who had more responsibility should be paid more.

Vidas said that by 1987 the disagreements with plaintiff were becoming quite divisive. Vidas also complained that projections of business volume did not come true and that the company took on space that it did not need. Defendants also complained that plaintiff treated them in a demeaning manner by acting as if he were "more equal" than the others and consulting them "less and less" on important business decisions. Vidas was also concerned that plaintiff had not trained potential successors to the three shareholders. Defendants were also upset about the location of their offices in the company's new headquarters. Consequently, on April 27, 1987, defendants told plaintiff that he should devote himself to operating problems and that Vidas would assume the position of CEO. Plaintiff did not agree to this course of action, but defendants proceeded with the plan without a formal vote. Defendants asserted that they made the change in order to address what they viewed as operating problems. Plaintiff retained the title of president and assumed the "collateral title of chief operating officer."

On June 9, 1987 the parties revoked the 1982 buy-sell agreement. The following month defendants told plaintiff that it was

time for Vidas to run the company. Plaintiff responded that he was vetoing the proposal under their no two-on-one agreement. Defendants replied that according to corporate counsel that agreement only applied to compensation. They said they were going to make the change whether plaintiff agreed to it or not. In order to avoid a "war," plaintiff agreed to let Vidas run Semcor. In return defendants agreed that plaintiff and Vidas would receive the same compensation. The parties agreed that Vidas would be president and chief operating officer and that plaintiff would resume the title of CEO. Plaintiff's $200,000 bonus and $250,000 salary as president were prorated for 1987 to cover only that portion of the year during which he was president.

Thereafter, plaintiff worked on developing a policies and procedures manual that could be used to manage Semcor, reviewed Semcor's internal financial statements, designed a deferred compensation plan for Semcor's employees, and performed other assignments requested by Vidas. Plaintiff volunteered for other assignments but was turned down by Vidas. Meanwhile in 1989, Donald Cook became chief operating officer of Semcor.

In April 1990 Vidas proposed a new arrangement whereby he would take the title of CEO in addition to president and chairman of the board, his salary would be increased, and he would receive a bonus. Plaintiff rejected this proposal. Eventually the parties agreed that another person should run the company. Consequently, in June 1990, Cook was made president of Semcor. The parties agreed that they would share the duties of CEO by rotating that position on a monthly basis, thereby allowing them to work less than full-time. Meanwhile, in May 1990, the parties had entered into a new shareholder agreement which provided in part that upon the death of any shareholder his shares would be purchased for $3,000,000. The agreement was funded by life insurance on the life of each shareholder.

In September 1990 Vidas told plaintiff that he wanted to buy him out. Plaintiff replied that he had no plans to retire and did not want to sell his stock in Semcor. Vidas told plaintiff that if he

did not sell his shares, plaintiff would no longer be an employee and would only receive a $36,000 director's fee. A week or two later Vidas restated this demand to plaintiff, after which plaintiff sought legal counsel. At a directors' meeting in October 1990, Vidas proposed that a new slate of officers be elected. Plaintiff noted that he could prevent this under the unanimity agreement. Defendants said that the agreement was no longer in effect because of the growth of the company. Plaintiff then accused defendants of trying to squeeze him out. Plaintiff was not elected an officer at the October 31, 1990 directors' meeting.

By December 1990 defendants, after consulting with corporate counsel, decided to terminate plaintiff as an employee and director of Semcor. They believed that plaintiff had not made any useful contributions to Semcor since 1987, and had delayed and complicated the decision-making process. Moreover, defendants found unworkable plaintiff's insistence that his attorney be present at meetings and his insistence on continuing the rotating CEO plan. Further, defendants informed plaintiff that they were considering the issuance of additional shares of stock which had the potential of diluting his interest.

A shareholders' meeting was held on December 3, 1990. The shareholders voted two to one to reduce the number of directors from three to two. Vidas and Degnan elected themselves as the two directors. Plaintiff objected to these actions because they violated the unanimity agreement and the ninety percent agreement in the 1968 bylaw amendment. The newly adopted bylaws provided that the number of directors would be determined from time to time by resolution of the shareholders. On the same day, Vidas told plaintiff to "clear [his] stuff out" of Semcor. Plaintiff refused. Two weeks later plaintiff received a memo from Vidas ordering him to clear his belongings out of Semcor's offices within three days. Shortly thereafter plaintiff filed this action.

Plaintiff received his year-end 1990 distribution, but no longer received bimonthly distributions of profits or a biweekly pay check. Plaintiff eventually left Semcor in February 1991. In July

1991, he received a distribution from Semcor in the amount of $200,000, and received an additional $550,000 in deferred compensation. Defendants deducted the cost of the life insurance premiums from plaintiff's compensation, but they did not do the same with respect to their compensation until late 1991. In addition, defendants discontinued certain of plaintiff's fringe benefits, such as accounting, tax and legal services. Plaintiff received no distribution of profits from Semcor in 1992, which he claimed was contrary to Semcor's policy of distributing profits and maintaining minimum retained earnings. Defendants said they chose not to make distributions in 1992 because of this litigation and the company's need for money. For 1992, Vidas' projected salary was $450,000 and Degnan's projected salary was $250,000.

The trial court rendered its written decision on January 26, 1994. It found that there was an oral agreement among the three shareholders that "all major decisions were to be made unanimously." However, the trial court concluded that there was no express agreement that each party would continue to enjoy managerial and employment rights with Semcor. Further, it concluded that defendants acted in good faith in removing plaintiff as president in July 1987, and that plaintiff ultimately agreed to that change, thus maintaining the unanimity agreement. However, the trial court found that defendants' decision to end the rotating CEO position was violative of the unanimity agreement. In concluding that defendants had acted oppressively and unfairly with respect to plaintiff, the trial court relied on defendants' decision in November 1990 to amend the bylaws reducing the number of directors from three to two in violation of the parties unanimity agreement. Further, the termination of plaintiff's employment with Semcor and the elimination of his position as a director of the corporation violated plaintiff's "unarticulated and reasonably existing expectation" that he would continue to enjoy these rights for as long as Semcor was a viable entity. The trial court also found that the alteration of the equal compensation agreement and the attempt to dilute plaintiff's stock interest violated plaintiff's reasonable expectations and was an attempt to effectively "freeze-out" plaintiff as

minority shareholder. In addition, the trial court found that defendants breached their fiduciary duty owed to plaintiff, as minority shareholder, by charging the cost of buy-out insurance to plaintiff, but not themselves, and eliminating certain of his fringe benefits.

Based upon these findings, the trial court concluded that the "history of the parties' actions in dealing with one another requires a buy-out," and ordered the majority defendants to sell their stock in Semcor to plaintiff. In addition, the trial court ordered that the Semcor bylaws be amended to provide for three directors and that plaintiff resume his prior position as a director, ordered that all major decisions of Semcor be subject to unanimous agreement, and ordered the directors to reemploy plaintiff as an officer. The trial court awarded compensatory damages to plaintiff but declined to award punitive damages, in part, because plaintiff was not totally without blame. On February 23, 1994 the trial court entered an order in accordance with its January 26, 1994 decision.

Defendants' motion for a stay pending appeal was denied by the trial court on February 23, 1994. We subsequently granted defendants' emergent application for leave to appeal. We stayed the appeal and remanded the matter for a determination of the valuation date, after which either party could appeal as of right within ten days of the order. We also stayed the order of February 23, 1994 pending appeal.

On April 29, 1994, the trial court entered an order setting a valuation date for Semcor stock of December 31, 1990, and on May 6, 1994, ordered Semcor to pay plaintiff compensation in the annual amount of $125,000 and to provide insurance benefits to him pending the resolution of this appeal.

## II

The trial court's determination that defendants' conduct was proof of oppression and unfairness sufficient to satisfy the standards of *N.J.S.A.* 14A:12–7(1)(c), *see Brenner v. Berkowitz*, 134

*N.J.* 488, 508–09, 634 *A.*2d 1019 (1993), is supported by substantial credible evidence in the record, *Rova Farms Resort, Inc. v. Investors Ins. Co. of Am.,* 65 *N.J.,* 474, 483–84, 323 *A.*2d 495 (1974). All of the issues of law urged by defendants regarding liability are clearly without merit. *R.* 2:11–3(e)(1)(A) and (D). We affirm the liability portion of this appeal essentially for the reasons expressed by the trial court in its written opinion dated January 26, 1994.

### III

■ We turn now to the remedies imposed. The trial court initially determined that while dissolution was not appropriate because the corporation remained a viable entity, a sale of stock was the proper remedy:

> It is patent that there has been an irretrievable breakdown of the relationships between the three and the ability of the three to deal with each other in managing the corporation. The hostility, acrimony and discord existing between Mr. Musto on one side and Messrs. Vidas and Degnan on the other not only has and will continue to annul any hope for harmony; but if I compel the parties to work together, it also will inevitably contribute to a pernicious aftermath injurious to the corporation and its employees. An order for sale would be fair and equitable to all parties under all of the circumstances of this case.... It would end the conflict, preserve the corporation and allow for a fair compensation for the selling owner's interest. The history of the parties' actions in dealing with one another requires a buy-out.

We are satisfied that there is sufficient credible evidence to support the trial court's findings regarding the irretrievable breakdown in relations between the parties. *Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., supra,* 65 *N.J.* at 483–84, 323 *A.*2d 495. However, we cannot agree with the trial court's drastic remedy to require defendants to sell their stock in Semcor to plaintiff and to reinstate plaintiff as a director and officer.

In ordering this remedy the trial court reasoned:

> [I]t seems incongruous to a court of conscience that a party who is oppressed by others and to whom those others have violated their fiduciary duties should be ordered to do something that party does not want to do where that party offers to do something which will attain the same result. To order Mr. Musto to divest himself of ownership rights in Semcor would effect a reward to Messrs. Vidas and Degnan for their improper conduct.... If, as I have already declared, there

should be a sale by one side in the dispute to the other, then that side which caused the mischief should endure the consequences.

The trial court also noted that since the proofs revealed that each of the three directors were capable of managing the corporation, no matter which side he placed in control of Semcor, the corporation would not necessarily suffer.

We begin our analysis with *N.J.S.A.* 14A:12–7(8) which provides:

Upon motion of the corporation or any shareholder who is a party to the proceeding, the court may order the sale of all shares of the corporation's stock held by any other shareholder who is a party to the proceeding to either the corporation or the moving shareholder or shareholders, whichever is specified in the motion, if the court determines in its discretion that such an order would be fair and equitable to all parties under all of the circumstances of the case.

In order to invoke this section, there must be a triggering event such as a violation of *N.J.S.A.* 14A:12–7(1)(c), *Bostock v. High Tech Elevator Indus., Inc.*, 260 *N.J.Super.* 432, 442, 616 *A.2d* 1314 (App.Div.1992), which we conclude the trial court appropriately found.

Recently, our Supreme Court in *Brenner v. Berkowitz, supra,* 134 *N.J.* 488, 634 *A.2d* 1019, discussed the procedures to be followed in determining a remedy when a court is faced with oppressive conduct on the part of the majority shareholders towards the minority. The Court noted that the remedy will depend on the harm to the minority shareholder or the minority's interest in the corporation. *Id.* at 508, 634 *A.2d* 1019. Dissolution is an extreme remedy, which should be imposed with caution after a careful balancing of the interests at stake. *Id.* at 511, 634 *A.2d* 1019. With respect to an alternative to dissolution—a court-ordered buy-out under *N.J.S.A.* 14A:12–7(8)—the Court noted that while the statute's plain language permits compulsion of the sale of a party's stock to either the moving shareholder or the corporation, it was inclined to construe the statute as authorizing only voluntary purchases by either a shareholder or the corporation. *Id.* at 512, 634 *A.2d* 1019. In addition, the Court observed that although a buy-out may be preferable to dissolution, there may be other remedies more appropriate than a buy-out and cited 2

*O'Neal's Close Corporations* § 9.35 at 169–71 (Callaghan & Co. 3rd ed. 1988), for that proposition. *Id.* at 514–15, 634 *A*.2d 1019.

In *Muellenberg v. Bikon Corp.*, 277 *N.J.Super.* 67, 648 *A*.2d 1161 (App.Div.1994), *certif. granted,* —— *N.J.* ——, —— *A*.2d —— (1995). We applied the principles of *Brenner* to invalidate the forced sale of the majority shares to a minority shareholder. In that case, differences arose between two shareholders, Muellenberg and Burg, regarding the day-to-day operations of the business as well as the amount of royalty fees that Bikon Corp. owed. *Id.* at 71–2. Ultimately, Muellenberg filed suit seeking dissolution of Bikon. *Id.* at 68–9. The trial court determined that Adda was a one-third equal shareholder along with Muellenberg and Burg and that Muellenberg and Adda had acted oppressively toward Burg, and therefore ordered them to sell their shares in the corporation to Burg for the fair market value of their shares as of the date the suit commenced. *Id.* at 74, 648 *A*.2d 1161. In reversing the remedy ordered, we concluded that:

Our laws governing corporations are based upon majoritarian principles. *Brenner v. Berkowitz, supra,* 134 *N.J.* at 511, 634 *A*.2d 1019; *Bostock v. High Tech Elevator Industries, Inc.,* 260 *N.J.Super.* 432, 444, 616 *A*.2d 1314 (App.Div.1992); *Warren v. Pim,* 66 *N.J.Eq.* 353, 387, 59 *A.* 773 (E. & A.1904). To the extent that Burg's conduct in managing the corporation was disagreeable to the majority, it could not prevail. If, in such a situation, the minority shareholder's fair and reasonable expectations are irredeemably frustrated, the remedy is not to order a resolution that frustrates the fair and reasonable expectations of the majority, but rather to require the corporation or majority shareholders to buy out the minority shareholder by paying a fair price for his stake in the corporation and possibly also, if legally sustainable and to the extent deemed necessary as a matter of equitable consideration, compensating him for the loss of a contract of employment. For a court to order the sale of the majority's shares is so contrary to basic principles of corporate governance as to require the existence of extraordinary equitable considerations and unavoidable consequences before such relief should be contemplated.

[*Id.* at 77, 648 *A*.2d 1161.]

The conclusion we reached in *Muellenberg* is equally applicable here. As noted above, *N.J.S.A.* 14A:12–7(8) requires that the remedy should be "fair and equitable to all parties." In our view, the remedy ordered by the trial court will not be fair and equitable to all parties. The defendants formed Semcor and participated in the company's decision-making for over a quarter

of a century. They continue to run the company and have substantially increased revenues during the pendency of this lawsuit. Moreover, the trial court determined that plaintiff was not "totally without blame" because he set the events in motion by his "overreaching conduct," which was "not appealing to a court of conscience." Further, the trial court described plaintiff as "obdurate," and noted that he had displayed an "imperious attitude." We note further that plaintiff has not been actively involved in the operation of Semcor for the past seven years. Under these circumstances the court ordered buy-out of defendant's shares and reinstatement of plaintiff as officer and director was not "fair and equitable to all parties."

Nevertheless, in light of the trial court's finding of "irretrievable breakdown" in the relationship of the parties, we find that the present case is an appropriate one to impose the remedy of a buy-out. That is, the majority should buy-out the minority.

On remand, the trial court must again determine the valuation date. *N.J.S.A.* 14A:12–7(8)(a) provides that shares ordered sold pursuant to a buy-out "shall be their fair value as of the date of the commencement of the action or such earlier or later date deemed equitable by the court. . . ." The trial court found no equitable reason to deviate from the statute's provision that the commencement date of the action be the "presumptive date" for valuation purposes and determined that December 31, 1990 was the valuation date. However, in light of our conclusion that plaintiff should not be re-employed by the corporation, the court ordered payment of salary to plaintiff, the passage of time since the filing of the complaint, and other factors the trial court may deem relevant, we do not foreclose the trial court from considering whether a different valuation date would be "deemed equitable."

## IV

■ Defendants also challenge that portion of the trial court's February 23, 1994 order requiring that plaintiff receive compensation equal to defendants for several years after 1990. The trial

court determined that plaintiff was improperly denied employment by defendants and ordered that the compensation paid to the three "be evened out, as they had agreed". This determination followed the trial court's finding that in 1987, plaintiff agreed that Vidas could become president conditioned upon plaintiff receiving compensation equal to Vidas. The equal compensation agreement was honored from 1987 until plaintiff was forced out in 1990. The trial court's findings in this regard are supported by sufficient credible evidence in the record. *Rova Farms Resort, Inc. v. Investors Ins. Co. of Am.*, 65 *N.J.* 474, 483–84, 323 *A.*2d 495 (1974).

Further, the equal compensation agreement did not provide for a fixed duration. In the absence of a fixed term, the trial court may impose a reasonable term. *In re Miller*, 90 *N.J.* 210, 219, 447 *A.*2d 549 (1982). Here, the trial court awarded plaintiff compensation equal to Vidas' compensation for 1991 and 1992.

Moreover, the chancery court, as a court of equity, has the power of devising the remedy and shaping it in order to fit the circumstances of the case and the complexities involved therein. *American Ass'n of Univ. Professors v. Bloomfield College*, 129 *N.J.Super.* 249, 274, 322 *A.*2d 846 (Ch.Div.1974), *aff'd*, 136 *N.J.Super.* 442, 346 *A.*2d 615 (App.Div.1975); *Brenner, supra*, 134 *N.J.* at 514, 634 *A.*2d 1019. Such an award is akin to an award of damages to a minority shareholder as compensation for an injury suffered as a result of the oppressive conduct by the majority. *Baker v. Commercial Body Builders, Inc.*, 264 *Or.* 614, 507 *P.*2d 387, 396 (1973), *cited in Brenner, supra*, 134 *N.J.* at 515, 634 *A.*2d 1019. In view of defendants' improper conduct towards plaintiff, it is a reasonable exercise of that power for the trial court to award damages to plaintiff equal to Vidas's pay for 1991 and 1992.

However, in light of our determination that plaintiff must sell his shares to defendants, we are satisfied that there is no longer a need to compel the individual defendants rather than the corporation to pay the compensation due plaintiff. The corporation is the employer, and would have paid plaintiff his compensation if he remained with the corporation. Since the individual defendants

will continue to own and operate the corporation, we are convinced that the fair and equitable remedy is to order that the corporate defendant pay plaintiff's salary, rather than the individual defendants.

We need to address one additional point with regard to the compensation issue. In April 1994, plaintiff filed a motion for prospective compensation. The trial court awarded plaintiff $125,-000 annually beginning May 1994, "subject to application for an adjustment upon conclusion of the appeal process, based on a claim of credit by one party for payments made." As a result of our determination that the award of $462,000 was reasonable and that the proper remedy is a court ordered buy-out of plaintiff's shares by defendants, we are satisfied that it would not be fair and reasonable to leave in place the award of $125,000 annually to plaintiff pending appeal, or for there to be any other additional compensation for the period after December 31, 1992. Therefore, on remand, the trial court shall give the corporate defendant credit for the amount of compensation paid to plaintiff pursuant to the May 6, 1994 order against the amount of money that defendants must ultimately pay to buy-out plaintiff's shares.

## V

Defendants' challenge to that portion of the February 23, 1994 order that required them to reimburse Semcor the expenses paid by Semcor on their behalf in defense of this litigation may be rendered moot by our decision. That is, since defendants are required to buy-out plaintiff's interest, unless the valuation date is changed, there is no good reason to require defendants to reimburse the corporation where they are the sole remaining shareholders. If on remand, the trial court determines that a different valuation date should be used, then the trial court should reconsider its order of reimbursement to the corporation by the defendants.

## VI

Finally, we find no basis for disturbing the trial court's denial of punitive damages. We agree that the circumstances here are not so egregious as to warrant punitive damages. *See Leimgruber v. Claridge Assocs, Ltd.*, 73 *N.J.* 450, 456, 375 *A.*2d 652 (1977).

## VII

In summary, we affirm the trial court's determination that defendants violated *N.J.S.A.* 14A:12–7(1)(c), that plaintiff is entitled to compensation in the amount of $462,000 (but from the corporation instead of the individual defendants), and its denial of plaintiff's claim for punitive damages. We reverse that portion of the order of February 23, 1994, that required (1) plaintiff to buyout defendants; (2) that Semcor's by laws be amended to provide for three directors; (3) plaintiff to resume his position as a director and have access to all of Semcor's corporate records and reports; (4) plaintiff to be reemployed; (5) that all major decisions of Semcor shall be subject to unanimous agreement; and (6) that defendants shall reimburse the expenses paid by Semcor on their behalf in defense of this litigation. With respect to the order of May 6, 1994, we reverse that portion of the order that directed Semcor to pay plaintiff annual compensation of $125,000 and fringe benefits. We remand to the trial court for additional proceedings consistent with this opinion.